RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0098p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MARK L. KERMAN and LUCY M. KERMAN,
                    *Petitioners-Appellants*,

        *v.*                                                    No. 11-1822

COMMISSIONER OF INTERNAL REVENUE,
                    *Respondent-Appellee*.

Appeal from the United States Tax Court.
No. 15894-06.

Argued: December 6, 2012

Decided and Filed: April 8, 2013

Before: KETHLEDGE and WHITE, Circuit Judges; LUDINGTON, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Donald L. Cox, LYNCH, COX, GILMAN & GOODMAN, PSC, Louisville, Kentucky, for Appellants. Judith A. Hagley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Donald L. Cox, Clare Feler Cox, Matthew D. Watkins, LYNCH, COX, GILMAN & GOODMAN, PSC, Louisville, Kentucky, for Appellants. Judith A. Hagley, Tamara W. Ashford, Gilbert S. Rothenberg, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────────

## OPINION

─────────────────

LUDINGTON, District Judge. A tax shelter can be legitimate — if the reported transaction has economic substance. But the shelter Mark Kerman participated in lacked

───────────────

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

such substance.  The transaction had no purpose other than the creation of an income tax benefit.  After Kerman claimed the benefit on his tax return, the IRS disallowed the deduction and imposed a valuation misstatement penalty pursuant to 26 U.S.C. § 6662(e), which was increased to 40 percent of the unpaid tax pursuant to § 6662(h). The tax court affirmed the IRS's decision.  Kerman appeals, contending that the shelter was legitimate and that, even if it was not, the penalty should not be imposed.  Because the transaction lacked economic substance and Kerman lacked reasonable cause or good faith to believe that it did, we AFFIRM.

I

A

Mark Kerman is a college-educated multi-millionaire.[1]    After earning a bachelor's degree in business administration from the University of Louisville, Kerman founded Kenmark Optical, Inc., a wholesale distributor of eyeglass frames. Headquartered in Kentucky, Kenmark imports frames from around the world and sells them to optical retailers, opticians, and optometrists under both its own brand and other licensed brands (such as Hush Puppies®).

Founded in 1972, Kenmark initially had annual sales of about $2 million.  By 1990, annual sales had grown to $20 million.  By 2000 — the tax year at issue in this case — annual sales approached $35 million.  Kerman's wealth grew with his company's successes.  In 2000, his personal net worth topped $12.5 million.

Kenmark finances its operations in part through a credit line with National City Bank.   In 2000, Kenmark's credit line was $12 million, with an interest rate of prime minus one-half percent (8.5 percent).

From its founding until 2000, Kerman was the sole owner of Kenmark.  This changed in May 2000, however, when Kerman sold an ownership interest to Kenmark's

---

[1] Kerman's wife, Lucy Kerman, is a party to this case because the Kermans filed joint tax returns. The parties agree that she had no personal involvement in the transactions at issue.

employee stock ownership plan. Specifically, he sold 27 percent of his stock for $6.1 million, realizing a taxable gain of $5.4 million.

Looking to shelter the gain, Kerman consulted his long-time friend and personal financial advisor, Bruce Cohen. The two men discussed two tax-savings strategies. One was a "basis boost" transaction, which Kerman decided not to pursue. The other was a "CARDS" transaction, which he did pursue.

B

CARDS, short for "Custom Adjustable Rate Debt Structure," was a tax-saving strategy introduced in the 1990s. Developed and promoted by Chenery Associates, Inc., the strategy centered on a "high basis, low value" foreign currency loan designed to create a tax benefit by offsetting real taxable income against an artificial tax loss.

Briefly, CARDS was designed to proceed in three stages: origination, assumption, and operation. It would start when a British company (not subject to U.S. tax law) borrowed a large amount of foreign currency from a foreign bank. A U.S. taxpayer (for whom the CARDS transaction was organized) would then receive a small amount of the borrowed currency from the British company. And the taxpayer would agree to be jointly liable for the full amount of the loan. The taxpayer would then exchange his portion of the foreign currency for dollars. A currency exchange is a taxable event. The taxpayer would claim that the currency's basis (the initial cost of the assets acquired) was the full amount of the loan, not simply the small amount of the currency actually purchased from the British company. Because of the currency's inflated basis, the taxpayer would claim that the exchange generated a large taxable loss. The dollars would be deposited in the same foreign bank with the balance of the foreign currency. One year later, the funds would be used to pay off the loan. Because the loan would be repaid rather than forgiven, the taxpayer would not recognize discharge of indebtedness income.

To illustrate the model with monetary values: A British company borrows $5 million worth of euros from a foreign bank. A US taxpayer then purchases $750,000

worth of the euros from the British company and agrees to be jointly liable for the entire loan — the full $5 million. The taxpayer exchanges the euros he actually purchased for dollars. For economic purposes, the currency exchange is a wash — $750,000 worth of euros for $750,000. For tax purposes, however, the taxpayer claims a $4.25 million loss, on the theory that his basis in the exchanged euros was $5 million. All of the currency — dollars and euros — remains at the bank as collateral, where they are used to unwind the loan one year later. Thus, the taxpayer is able to report a large tax loss without an economic loss.

In a nutshell that's the CARDS strategy. But the substance of the strategy (more precisely, the lack thereof), is in the details.

1

To set the strategy in motion, Chenery needed not only a client — a US taxpayer seeking shelter for a taxable gain — but the cooperation of three other parties as well. First, it needed a foreign bank to make the loan. It found a willing partner in German bank Bayerische Hypo-und Vereinsbank AG ("HVB").[2] Next, Chenery obtained the cooperation of a partner at a prominent law firm, Raymond Ruble of Brown & Wood, LLP,[3] who prepared a sample tax opinion concluding that the CARDS strategy is a legitimate type of tax shelter. And it needed a few Brits.

That is, each particular CARDS transaction begins with British citizens creating a limited liability company for the sole purpose of facilitating the particular transaction for a US taxpayer. Registered in Delaware, the LLC is capitalized according to the size of the tax loss that the US taxpayer wishes to generate (specifically, the cooperating bank requires the LLC to be capitalized at 3 percent of the face value of the foreign

---

[2] Because of its involvement in CARDS and other tax schemes, HVB was investigated by the federal government. In 2006, HVB entered into a deferred prosecution agreement and acknowledged that it had facilitated "fraudulent tax shelter activities," including CARDS transactions. HVB paid a $30 million penalty.

[3] Brown & Wood has since merged with Sidley & Austin, LLP. Because of its involvement in the CARDS strategy, Sidley was investigated by the federal government and paid a civil penalty. Mr. Ruble is currently serving a 78-month sentence in federal prison for his tax shelter activities.

currency loan). While a separate LLC is created for each CARDS transaction, the members are always British citizens, so that the LLC is a tax resident of Great Britain. This is important for tax purposes because under the US-Great Britain tax treaty, the LLC will not be subject to US income tax.

Shortly after its creation, the LLC enters into a credit agreement for a loan denominated in foreign currency with one of the foreign banks privy to the CARDS strategy, such as HVB. The loan is denominated in foreign currency because a loss realized on the disposition of foreign currency is an "ordinary" loss under U.S. tax law, which may be used to offset both ordinary income and capital gains.

The loss that the taxpayer wants to recognize through the CARDS transaction determines the amount of the loan. The loan has a 30-year term, with interest payments due annually and the principal due after 30 years. Under the credit agreement, however, the loan may be unwound by either party without penalty after the first year (and, moreover, the parties informally agree that the loan will in fact be unwound after the first year). The interest rate on the loan floats with the LIBOR plus a credit spread.

Importantly, the bank retains the proceeds of the loan as the "collateral" for the loan. This ensures that the loan may be repaid from the liquid collateral at any time. And it ensures that the LLC cannot default on its obligations to make interest payments on the loan.

2

After executing the credit agreement with the bank, the LLC executes a purchase agreement with the particular U.S. taxpayer who has initiated the CARDS transaction.

Under the purchase agreement, the LLC transfers the present value of the principal repayment —15 percent of the loan proceeds denominated in euros — to the taxpayer in exchange for the taxpayer's commitment to repay the principal when the loan matures. (The LLC is also compensated by Chenery for its troubles, which, in turn, is compensated by the taxpayer.)

The purchase agreement provides that the LLC will make the annual interest payment and the taxpayer will repay the principal. It further provides that the taxpayer will sign the LLC's credit agreement with the bank as a co-obligor and assume joint and several liability for the full amount of the loan. This is important for tax purposes because under assumption of liability principles the taxpayer claims that his basis is not the 15 percent of the loan proceeds that he actually received, but the 100 percent of the loan that he agreed to be jointly and severally liable for.

3

The taxpayer then exchanges his 15-percent share of the loan (received in euros) for US dollars — a taxable event. Claiming a basis in the full amount of the loan, the taxpayer realizes a tax loss of 85 percent of the face value of the loan. (On a $5 million loan, for example, the taxpayer's "loss" would be $4.25 million.)

The U.S. currency is deposited with the bank, where it earns interest (at a lower rate than the interest charged on the loan). Then, one year after it began, the transaction is unwound. The "collateral" held by the bank (the money loaned) is used to pay off the loan. But because the loan is repaid rather than forgiven the taxpayer does not recognize a "discharge of indebtedness" gain.

4

For setting up the structure, Chenery charges a fee of 10 percent of the total amount of the loan. On a $5 million loan, for example, Chenery charges a $500,000 fee. After the loan is paid, the LLC is dissolved.

C

In August 2000, the IRS issued Notice 2000-44, 2000-2 C.B. 255. Titled "Tax Avoidance Using Artificially High Basis," the notice warned taxpayers that "transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes."

Notwithstanding the notice, however, Chenery continued to market the CARDS strategy to US taxpayers seeking to shelter taxable gains.

D

CARDS transactions, as noted, were promoted by Chenery as producing noneconomic tax losses through high basis, low value foreign currency loans — "the taxpayer claims a tax loss . . . even though the taxpayer has incurred no corresponding economic loss." To reassure potential clients that they would not be subject to penalties for the understating of income tax, Chenery provided clients with a sample tax opinion prepared by a partner with Brown & Wood, Raymond Ruble.

The Ruble opinion addresses IRS Notice 2000-44, concluding: "It is at least questionable whether Notice 2000-44 is properly issued under Code Section 7805" because the notice "neither describes in any detail the contents to be included in a future temporary, proposed, or final regulation."

Additionally, the Ruble opinion determines that a CARDS transaction is a legitimate tax avoidance strategy. First, it concludes, the purchase agreement between the LLC and the taxpayer constitutes a sale of 15 percent of the foreign currency obtained in the loan. But no more. That is, the taxpayer does not purchase the other 85 percent of the currency (which remains in the bank as collateral for the loan) because the LLC retains a sufficient ownership interest in those funds.

Second, because the taxpayer agrees to be jointly and severally liable for the entire loan, the taxpayer's basis is 100 percent of the currency obtained in the loan, not merely the 15 percent that the taxpayer receives under the purchase agreement.

Third, the loss on the disposition of the foreign currency is an ordinary loss under § 988 of the Internal Revenue Code (26 U.S.C. § 988).

Fourth, the taxpayer recognizes no income on the repayment of the loan. The LLC's surrender of the collateral to the bank upon prepayment of the loan is not cancellation of indebtedness because the debt was not cancelled, but repaid in full by a

co-obligor. The Ruble opinion elaborates: "We have found no case in which a taxpayer was treated as recognizing cancellation of indebtedness income under Code Section 61(a)(12), or the cases decided thereunder, where the creditor was repaid in full, as we assume will be the case in the instant situation. Similarly, we have found no cases in which a co-obligor was taxable under Code Section 61(a)(12) where all or a portion of the indebtedness was paid by another co-obligor."

Finally, the opinion cautions that the transaction must have economic substance and a business purpose. It must be entered into "to generate a return that will exceed by more than a de minimus amount the all-in cost of borrowing." But the opinion does not explain — much less analyze — how a taxpayer could expect to earn a return exceeding the cost of borrowing when the bank requires cash or cash equivalents of equal or greater value to secure the use of any of the loan proceeds. (As the IRS puts the point, "to obtain $1 of CARDS 'financing,' the 'borrower' had to first give the bank $1 or more in cash or cash equivalents." Appellee Br. 4-5.)

E

After Kerman's friend Cohen brought the CARDS strategy to his attention during the summer of 2000, he looked over the promotional materials prepared by Chenery, including the sample tax opinion prepared by Ruble. Despite his awareness that Ruble was working with the CARDS promoters, Kerman did not seek any other written opinion on the CARDS transaction. And while he "assumed" that his personal accountant, Kevin Gibbs, and his attorney, Steve Goodman, reviewed the CARDS transaction, neither furnished him with a formal opinion. Likewise, no financial analysis of the transaction's economic substance was conducted. No business plan was prepared. No cost-benefit calculations comparing the all-in costs of borrowing with the expected returns on the loan were run.

Because Kerman wished to generate a $4.25 million tax loss for 2000, a CARDS transaction with a $5 million loan was implemented.[4]   Chenery charged Kerman a flat fee of 10 percent of the face value of the loan (half a million dollars).  Here's how the transaction occurred.

1

A limited liability company, Colindale Financial Trading, LLC, was created on November 30, 2000 by two British citizens.  It was capitalized with a note receivable from its members in the amount of £102,145 (three percent of the $5 million loan that Colindale was set up to obtain).

On December 5, 2000, Colindale entered into two agreements with HVB: a credit agreement and a master pledge and security agreement.  Under the credit agreement, Colindale borrowed €5,700,000 ($5 million) for a purported term of 30 years.  The loan could not be prepaid for the first 12 months of the agreement, but could thereafter without penalty.

Interest rates under the credit agreement were divided by time periods.  The first ran for the first month of the agreement (from December 5, 2000 to January 5, 2001).  The second ran for the next eleven months (from January 5, 2001 to December 5, 2001).  Thereafter, they would run for one year terms (although the participants knew that the transaction would not last that long).  For the first interest period, the interest rate was set at the London Interbank Offered Rate (LIBOR) plus 50 basis points, or 5.51875 percent.  For the second period, the interest rate was 5.5188.  For any subsequent period, HVB had the unilateral authority to set the interest rate.

Under the master pledge and security agreement, Colindale pledged all of its holdings at HVB, including interest earned, as collateral for the loan.  The euros were then transferred to Colindale's HVB account, where they would remain as collateral for the loan until it was unwound one year later.

---

[4]HVB, for example, kept a spreadsheet listing the "desired loss" for their CARDS customers, including Kerman.  For Kerman, the spreadsheet listed a desired loss of $4,250,000.

2

On December 20, 2000, Kenmark wired $500,000 to HVB, which was credited to an account in Kerman's name. Kenmark then debited its account payable to Kerman. (This was the only time that Kenmark's finances were involved in the transaction.)

On December 21, 2000, Kerman entered into two agreements with Colindale: (1) a purchase agreement, and (2) an assumption agreement. When executing these agreements, Kerman had no knowledge of Colindale or its members. He had not investigated Colindale's capitalization or contacted its members (or even learned their identities).

Under the purchase agreement, Colindale agreed to give Kerman the present value of the loan principal, €855,000 ($784,750). Under the assumption agreement, Kerman agreed to be jointly and severally liable for Colindale's obligations under the credit agreement, including repayment of the loan principal of €5,700,000. The parties further agreed that Colindale would make all interest payments and that Kerman would pay the principal due under the loan at maturity. And to ensure that Colindale had the funds available when needed, the purchase agreement provided that Colindale would not request the release or withdrawal of any collateral from HVB without Kerman's prior written consent.

The same day that Kerman entered into the agreements with Colindale, he entered into an "assuming party master pledge and security agreement" with HVB. Under that agreement, Kerman pledged all of his holdings at HVB, including any interest earned, as collateral for the foreign currency loan. The agreement further provided that Kerman could request to substitute other collateral, but that substitution required HVB's approval. HVB then transferred €855,000 from Colindale's HVB account into Kerman's HVB account. The effective interest rate on the loan (when the transaction costs were factored in) was about 75 percent.

3

The next day (December 22, 2000), Kerman executed a forward exchange contract to hedge against the risk of a stronger euro increasing the cost of exiting the CARDS transaction.  Under the contract, Kerman agreed to exchange $880,000 for €925,000 on December 5, 2001.  This amount would be sufficient to pay off the loan with HVB, which had to be repaid in euros, at the earliest possible date that the loan could be terminated.  In the meantime, it would protect him from fluctuations in the dollar-euro exchange rate.  The forward contract cost Kerman $22,000.

Over the next five days, Kerman exchanged the €855,000 held in his HVB account for $784,750.  Asserting that his basis in the euros was $5 million, on his 2000 tax return Kerman claimed that his sale of the foreign currency resulted in a $4,251,389 loss (included in this amount is $1,389 for amortization fees[5]).

The amounts credited to Kerman's balance in his HVB pooled accounts were used to purchase three different time deposits. The interest rates were lower than those charged on the loan.[6]   Each had a maturity date of December 5, 2001.

On December 31, 2000, Kerman received a formal tax opinion letter from Ruble. Kerman never met Ruble, he never paid any fees directly to Ruble or his firm, and there is no evidence that Kerman even spoke with anyone at Brown & Wood.  The final version of the opinion is identical to the sample tax opinion that had been included in the promotional literature given to Kerman before the transaction.

---

[5]Kerman's accountant would later acknowledge that he calculated the loss based not on the actual receipts from the foreign currency exchanges and the HVB bank statements, but on the promotional materials prepared by Chenery before Kerman participated in the CARDS transaction. Likewise, although the tax return was completed after the loan was unwound and the CARDS transaction was completed, the amortization of fees was based on the 30-year schedule provided in the promotional materials prepared by Chenery.

[6]Because the interest rate paid on Kerman's time deposits was less than the loan rate, the rate spread actually rendered the transaction more unprofitable the longer it continued.  As the tax court observed: "Because HVB paid lower interest rates on [Kerman's] deposits than it charged on the loan, leaving the loan proceeds in the Bank guaranteed a loss to [Kerman's] portion of the proceeds."  Kerman acknowledges the rate spread issue in his brief.  He counters with an accurate (if unresponsive) assertion, writing: "Inexplicably, the Court also criticized the fact that HVB paid a lower interest rate on its deposits than it demanded on the loan.  This is industry practice because otherwise banks would operate in the red." Appellant's Br. 23 (footnote omitted).

In May 2001, Kenmark's chief financial officer, Michael Shields, emailed HVB about adding "credibility" to the loan. "I would like to have you and Chenery work out whatever arrangement is necessary in order to add 'credibility' to the PV of the loan proceeds in Mark Kerman's account," Shields wrote, asking "what amount may be safely withdrawn from the HVB account and otherwise put to good use (even if still pledged as collateral)?"

In June 2001, HVB issued an account statement to Kerman. Noting that the loan would terminate on December 5, 2001, the statement informed Kerman that just under €925,000 would be required from Kerman at that time to unwind the loan. (Kerman's future contract set to mature on December 5, 2001, as noted, was for €925,000.)

In August, HVB sent Kerman a letter notifying him that the interest rate would be more than doubling in 2002. On August 30, 2001, Kerman sent formal notice to HVB and Colindale informing them of Kerman's intention to "pay-off (and thereby terminate)" the loan on December 5, 2001.

In October 2001, Kerman executed a control agreement on behalf of Kerman Investments, LLC (a personal investment vehicle of Kerman's) with HVB for a Salomon Smith Barney cash securities account. Under the control agreement, the cash securities account could only contain cash, cash equivalents, or qualified municipal bonds. On October 31, HVB transferred $400,000 from Kerman's HVB account to Kerman's cash securities account at Smith Barney. The funds deposited in the cash securities account earned less interest than they had at HVB.

The following month, the Chenery employee who had set up Kerman's CARDS transaction, Craig Stone, emailed Kerman, Shields, and Goodman. "I understand that [Kerman] may have a need for another CARDs financing in the near term if he sells [the remainder of] his business. Frankly, I do not [know] where that subject stands as of this moment. Perhaps either [Kerman] or [Goodman] could bring us up to date on that subject?" (Kerman, evidently, did not take Chenery up on its offer.)

Also in November 2000, HVB issued a mandatory prepayment election notice to Kerman notifying him that the outstanding principal amount of the loan plus accrued interest was due on December 5, 2001.  Because of the $400,000 wire transfer from HVB to Salomon Smith Barney, however, there was a shortfall of $184,798.92 to unwind the CARDS transaction.  HVB explained in an email: "In order to unwind, we need for Mr. Kerman to simply wire in the money that makes up the difference between what is held here and what has been wired out for his investment."

On December 4, 2001, Kerman wired $184,798.92 from the Smith Barney account to the HVB account.

On December 5, 2001, Kerman's forward contract matured and settled, resulting in $880,600 being exchanged for €925,000.  The total amount required to pay off Kerman's portion of the loan was €924,906.27.  This was added to the €6,018,937.76 held in the Colindale account (comprised of principal plus accumulated interest).  That day, the loan was repaid in full.

4

After the loan was paid off, an excess of $581.91 remained in Kerman's HVB account.  HVB wired the funds to Kerman's Smith Barney account.  On January 8, 2002, HVB notified Smith Barney that it was terminating the control agreement and releasing its security interest in Kerman's Smith Barney account.  Colindale dissolved a few months later.

Kerman earned $63,194 in interest on the CARDS loan.  His cost of borrowing, however, exceeded $600,000.  Thus, the CARDS transaction resulted in a net economic loss of more than half a million dollars — apart from the claimed tax benefit, that is.

F

On March 14, 2002, Sidley Austin (Brown & Wood's successor) wrote to Kerman to notify him of "a new Internal Revenue Service voluntary disclosure program" and "strongly recommend that, if you have not already done so, you consult with your

regular tax advisor regarding the terms and implications of the voluntary disclosure program." Noting that program participants could obtain protection against tax penalties for substantial understatement of income tax, the letter went on to observe:

> The liberality of the IRS voluntary disclosure program makes it worthy of serious consideration by any taxpayer that may have a questionable item on his return. In the case of any taxpayer who engaged in transactions of a type that may be disclosed or by other taxpayers where the same promoter or advisor may have been involved, consideration is essential. In this specific regard, we are not certain, but expect may be possible, that co-obligor transactions of the type in which you engaged may be disclosed by others.

On March 18, 2002, the IRS issued a notice describing a CARDS transaction and cautioning:

> Under the facts and circumstances of the transaction described in this Notice, as a matter of economic reality, the parties will bear responsibility for repayment of the Loan in accordance with their relative ownership of the Assets immediately after the transfer from Transferor to Taxpayer. Accordingly, the Service and the Treasury believe that Taxpayer's basis in the Conveyed Assets is equal to the fair market value of such assets upon their acquisition by Taxpayer. The losses purportedly resulting from the transaction described in this Notice (or substantially similar to the transaction described in this Notice) are not allowable to the extent Taxpayer derives a tax benefit that is attributable to a basis in excess of the fair market value of the Conveyed Assets.

I.R.S. Notice 2002-21, 2002-1 C.B. 730. Warning that "the Service may impose penalties on participants in these transactions or, as applicable, on persons who participate in the promotion," the notice concluded: "The Service and the Treasury recognize that some taxpayers may have filed tax returns taking the position that they were entitled to the purported tax benefits of the type of transaction described in this Notice. These taxpayers are advised to take prompt action to file amended returns." *Id.* Kerman decided not to disclose his transaction to the IRS or amend his tax returns.

In June 2003, Kerman's 2000 tax return was audited. Kerman's accountant responded to the audit by representing that Kerman had made a profit on the CARDS

loan of $63,194.  He did not, however, account for the transaction costs associated with the loan.

In August 2005, Ruble was indicted in federal court, charged with tax evasion "for designing, implementing, and marketing fraudulent tax shelters."  *United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010).  He was convicted and sentenced to 78 months of imprisonment.

In 2006, both Sidley Austin and HVB settled cases with the IRS and the Department of Justice.  Sidley agreed to pay an undisclosed civil penalty because of Ruble's conduct.  Sidley acknowledged "Ruble was involved in, and issued opinions for, transactions for certain high net worth individuals.  Ruble's conduct in those transactions defrauded the U.S. Treasury of taxes owed by those taxpayers. . . .  He authored opinions on a number of different tax shelter transactions, including . . . CARDS."  HVB agreed to pay about $30 million to the U.S. government for its participation in a number of "fraudulent tax shelter activities," including CARDS.

Also in 2006, the Commissioner issued a notice of deficiency to Kerman, disallowing the $4.25 million loss claimed on the 2000 income tax return and imposing an accuracy-related penalty.  Specifically, the Commissioner determined a tax deficiency of $1,248,876 and imposed a penalty of $499,550.40.

Kerman petitioned the tax court for a redetermination of the deficiency pursuant to 26 U.S.C. § 6213.  He also filed suit against Sidley Austin and Chenery Associates. (Sidley settled, giving Kerman $595,000.  The case against Chenery Associates has been stayed pending this appeal.)

G

1

Trial in the tax court was held in January 2010.  Five people testified: Kerman; Shields (Kenmark's chief financial officer from 1994-2002); Gibbs (Kerman's personal

accountant); Cohen (Kerman's former personal financial advisor); and Lawrence Kolbe (an expert witness for the Commissioner).

Kerman testified that he entered the CARDS transaction for two reasons — to provide working capital to Kenmark and to reduce his personal tax burden:

> I entered it for, one I needed — it was a good business investment, gave me the ability to borrow money if I was up to the top of my line of credit. We were getting read[y] to put in new lines of frames . . . the Vera Wang collection, and stuff like that. It would have cost $1 to $2 million at least to do the Vera Wang collection. I wanted some other options other than the line of credit . . . . And they said it was a tax deduction. So I figured one way — both the reasons would be a good reason.

Shields likewise testified that Kerman entered into the CARDS transaction to provide working capital to Kenmark, explaining:

> One of the features of the CARDs transaction as presented was the ability to substitute collateral for the investment at HVB and then be able to borrow the funds from HVB. And the understanding was to be able to plow that money back into Kenmark Optical, either via contributed capital or a loan.

Shields also asserted that "Kenmark Optical was bumping up against its credit limit with National City Bank." When Shields was asked about his email that referenced adding "credibility" to the loan, Shields explained that "the information that [Kerman] was looking for was his statement of position in order to borrow the money from the investment account and, again, plow it back into Kenmark Optical."

On cross-examination, Shields acknowledged that Kenmark did not in fact borrow or receive any funds from the CARDS transaction. Rather, Kenmark paid out $500,000 to Kerman and debited its account payable to him. Shields further acknowledged that he was informed prior to the execution of the CARDS transaction that it "would only be a one-year deal."

Gibbs testified that he completed Kerman's income tax returns in 2000. Regarding the losses claimed because of the CARDS transaction, Gibbs explained: "It came from various discussions and information I received from meetings we had with

Chenery and Associates, and then I later confirmed it with the attorneys from Brown and Wood." Addressing the Ruble opinion in particular, Gibbs testified: "I found the analysis within the opinion to be very persuasive." He acknowledged, however, that he never spoke with any attorneys at Brown & Wood.

Cohen, in contrast, recalled that Kerman said that he was interested in the CARDS transaction because of its tax consequences — not Kenmark or its operating needs. "It was simply a tool. And the tool had one purpose and one purpose only," Cohen testified. On cross-examination from Kerman's counsel, Cohen acknowledged that he was serving a federal prison sentence for tax fraud and perjury. He was asked:

> Q: Do you acknowledge that your lying was a character trait of yours?
>
> A: I think I already answered that.
>
> Q: Would you answer it again, please.
>
> A: Delighted to. Yes, one I'm ashamed of and it's part of me, yes.
>
> Q: And this is a character trait that you've possessed for a number of years, isn't it?
>
> A: No argument. That would be a yes.
>
> Q: You're a habitual liar?
>
> A: I would disagree with that statement. I may have been a habitual liar. I would accept that statement unequivocally.

Finally, the government's expert, Kolbe, testified. Kerman's counsel initially had no objection to Dr. Kolbe being "admitted as an expert in the area of financial economics in order to provide expert testimony to assist the Court." Later, however, counsel objected to the admission of Kolbe's expert report, asserting:

> The first grounds for the objection to the admission of the report is that it is not based on reliable facts as required under Section[s] 702 and 703. The expert has testified there's no standard set in the industry on what an economically rational or irrational transaction is. And yet that is what he is testifying about. . . .
>
> In addition, the facts upon which he has relied on, one of the critical facts [has] been the documents from these ten other taxpayers [who

> participated in CARDS transactions].  He's admitted that he's received partial documents from these.  He's admitted that these documents have been filtered by the Internal Revenue Service.  There are at least 50 other taxpayers who had a CARDS transaction that he's not reviewed.
>
> And so his record is not complete.  Again, this goes to the reliability of his report.
>
> . . .
>
> The only fact in which he is actually testifying is to the rationality of this transaction.  And that's a transaction — that's a determination that's left for this Court.

The court overruled the objection, explaining: "I am going to admit this report.  I do think it's consistent with the type of economic analysis that's generally admitted in analyzing, from an objective perspective, the rationale for want of a better word, of taxpayers entering into transactions similar to this. . . .  I don't think the flaws you've enunciated rise to the level to make the report . . . be non-admissible under [*Daubert*]."

2

In March 2011, the court issued its opinion disallowing Kerman's claimed loss and imposing a "valuation misstatement" penalty pursuant to 26 U.S.C. § 6662(e) and (h).  Disallowing the deduction, the court concluded that the CARDS transaction lacked economic substance.  The court explained that "putting aside the tax deduction, the economically rational course of action is to not undertake the CARDS transaction at all and to end it as soon as possible.  The loan makes no economic sense as a source of financing."

The court also imposed a "valuation misstatement" penalty pursuant to 26 U.S.C. § 6662(e) and (h).  But first, conducting a survey of the available penalties under § 6662, the court discussed not only the penalty for a valuation misstatement, but also that for a "substantial understatement of income tax."  *See* 26 U.S.C. § 6662(d), (e).  The court noted that a substantial understatement penalty must be "reduced by that portion of the understatement which is attributable to: (1) The tax treatment of any item if there is or was substantial authority for such treatment; or (2) any item if the relevant facts affecting

the item's tax treatment are adequately disclosed in the return or, in a statement attached to the return, and there is a reasonable basis for the tax treatment of such item by the taxpayer."

The court then went on, however, to specifically impose the valuation misstatement penalty pursuant to § 6662(e) and (h).  Citing *Illes v. Commissioner*, 982 F.2d 163 (6th Cir. 1992), the court explained that "where a transaction is disallowed for lack of economic substance and the artifice of the transaction was constructed on the foundation of the overvaluation of assets, the valuation overstatement penalty applies." But, the court noted, under § 6664(c)(1) an "accuracy-related penalty may not be imposed with respect to an underpayment if the taxpayer's actions regarding it can be justified by reasonable cause and the taxpayer acted in good faith."  Reliance on expert advice, the court further observed, "is unreasonable when the advice would seem to a reasonable person to be too good to be true."  Finding that Kerman's conduct merited the accuracy penalty, the court explained that Kerman neither reasonably relied on expert advice nor acted in good faith:

> Mr. Kerman represented that he reasonably believed that the assets, or the proceeds from the sale, could be used to generate a return that would exceed "by more than a de minimis amount the all-in cost of borrowing," including fees and costs paid to third parties "and without regard to Federal income taxes." However, as discussed above, he had no purpose to use the loan proceeds, so this representation is false.
>
> . . .
>
> Mr. Kerman testified that he had no knowledge or understanding of the CARDS transaction.  He did not read, review, or remember the documents executed as part of the CARDS transaction.  He was either not familiar with or had only a superficial recollection of Mr. Hahn, Chenery, Colindale, and HVB and its affiliates.  As Mr. Cohen testified, it is obvious that Mr. Kerman was motivated by the tax aspects of the CARDS transaction.  To believe Mr. Kerman's story, one must believe that he paid over $600,000 in fees and costs to receive "financing" of $784,750.  As a capable businessman and prudent investor, Mr. Kerman knew or should have known that the CARDS transaction was just too good to be true.

And because Kerman had overstated his basis in the foreign currency obtained in the transaction by more than 400 percent, the court imposed the "gross" valuation misstatement penalty pursuant to § 6662(h).

This appeal followed.

## II

## A

In examining whether Kerman's claimed tax loss should be disallowed because it lacked economic substance, "the district court's findings of fact are reviewed for clear error. The district court's ultimate conclusion that a transaction is or is not an economic sham is reviewed de novo." *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (citation omitted) (citing *Am. Elec. Power Co. v. United States*, 326 F.3d 737, 741–42 (6th Cir. 2003)). That is, "while the factual findings underlying a sham determination are reviewed for clear error, the legal standards employed and the ultimate conclusion are reviewed de novo." *Dow Chem. Co.*, 435 F.3d at 599 n.8 (citing *Kennedy v. Comm'r*, 876 F.2d 1251, 1254 (6th Cir. 1989); *Rose v. Comm'r*, 868 F.2d 851, 853 (6th Cir. 1989)).

## B

Section 165 of the Internal Revenue Code permits "as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). But the treasury regulations caution, "Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." 26 C.F.R. § 1.165-1(b). And "the burden of clearly showing the right to the claimed deduction is on the taxpayer." *Dow Chem. Co.*, 435 F.3d at 599 (citing *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992)).

"To be valid," this Court instructs, "an asserted deduction must satisfy both components of a two-part ["*Mahoney*"] test. The threshold question is whether the transaction has economic substance. If the answer is yes, the question becomes whether

the taxpayer was motivated by profit to participate in the transaction." *Illes v. Comm'r*, 982 F.2d 163, 165 (6th Cir. 1992) (citing *Rose*, 868 F.2d at 853; *Mahoney v. Comm'r*, 808 F.2d 1219, 1220 (6th Cir. 1987)).

Part one of the *Mahoney* test is objective: "If the transaction lacks economic substance, then the deduction must be disallowed without regard to the 'niceties' of the taxpayer's intent." *Illes*, 982 F.2d at 166 (quoting *Mahoney*, 808 F.2d at 1220). The focus under part one is "the transaction, not the taxpayer." *Id.* Only at part two does a court focus on the taxpayer's subjective intent. *Id.*

A transaction that lacks economic substance is a "sham." *Dow Chem. Co.*, 435 F.3d at 599. "The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses." *Id.* (quoting *Rose*, 868 F.2d at 853). That is, if the tax benefits are put aside, do the expected benefits exceed the costs?

One "hallmark" of a sham transaction is that it has "negative pre-deduction cash flows (that become positive when the benefit of interest deductions is considered)." *Id.* at 600 (brackets omitted) (quoting *Am. Elec. Power Co.*, 326 F.3d at 742). That is, without the tax advantages, the transaction is a losing proposition. Another is that the claimed tax benefit, rather than having economic substance, is seemingly created "from thin air." *Am. Elec. Power Co.*, 326 F.3d at 743 (quoting *Sacks v. Comm'r*, 69 F.3d 988 (9th Cir. 1995)). That is, sham transactions are characterized by artificial losses that have only upsides — they appear on the tax return, but not the profit and loss statement.

Kerman's CARDS transaction has both hallmarks of a sham transaction. First, the transaction had negative pre-deduction cash flows in excess of half a million dollars (apart from the tax benefits). The transaction cost more than $600,000 and returned little more than $60,000; it had an effective interest rate of about 75 percent.[7] But for the claimed tax benefits, the transaction was a losing proposition. Further, no credible

---

[7]To borrow about $750,000 for one year, Kerman had to pay not only an interest rate of 5.5 percent, but also borrowing fees of more than $600,000.

business purpose for using such an expensive financing vehicle existed. As the government's expert witness elaborated, regardless of what investment Kerman planned to use the loan proceeds for (if any), financing with a CARDS transaction did not provide him with a reasonable possibility of profit:

> The interest rate with Chenery's fees taken into account is just under 70 percentage points (7,000 basis points) above the market rate. This represents an absurdly high interest rate to pay for funds of this degree of risk. It is also a very material drag on the profitability of whatever investment might be made with the Taxpayer's share of the loan financing. It is simply not a sound business or investment practice to finance investments, even good investments, with bad loans, and particularly not with loans as bad as this one was.

> As indicated above, there were some unusual features of the Taxpayer's investment decisions in the present case. In particular, at least some of the proceeds of the loan were left in the Bank, which paid less interest than due on the Loan. This guarantees a loss to the Taxpayer on that part of the money, even absent the fees involved, which is an unusual use of the funds from an investment perspective. Moreover, part of the Loan proceeds appear to have been used to pay Chenery's fee. Money devoted to this use generates no non-tax return at all, an even more unusual use from an investment perspective.

> Considered objectively, these transactions did not provide the taxpayer with a reasonable possibility of profit, taxes aside, by any economically sensible definition of the phrase, "reasonable possibility."

If the tax benefits are included in the cost-benefit calculation, however, the CARDS transaction was net-positive. Kerman used it to offset the gain he realized on the sale of his Kenmark stock, generating a tax benefit of $1,248,876. With the tax benefits factored in, the transaction goes from a net loss of more than $600,000 to a net gain of more than $600,000.

Moreover, the CARDS transaction was expressly designed to create a tax loss from thin air. Or, as Chenery put the point in its promotional materials, "the taxpayer claims a tax loss . . . even though the taxpayer has incurred no corresponding economic loss." The CARDS transaction had the economic substance of a house of cards.

C

Against this conclusion, Kerman makes several arguments. None have merit. First, Kerman asserts that he had legitimate business purposes for entering the transaction, writing that he "intended to maintain the CARDS loan for its full 30-year term as additional funding for European expansion and the Vera Wang eyeglasses line. The additional funding was necessary because of the many restrictions placed on the National City credit line." Appellant's Br. 63. In support of his argument that his subjective intent should be considered, Kerman relies on the statement in *American Electric* that "A taxpayer's subjective business purpose and the transaction's objective economic substance may be relevant to [the economic sham] inquiry." *Am. Elec. Power Co.*, 326 F.3d at 741 (quoting *Rose*, 868 F.2d at 853), *quoted in* Appellant's Br. 61.

As noted, however, Kerman's transaction had no practicable economic effects other than the creation of income tax losses. Consequently, "the deduction must be disallowed without regard to the niceties of the taxpayer's intent." *Pasternak v. Comm'r*, 990 F.2d 893, 898 (6th Cir. 1993).

Elsewhere in his brief, Kerman invites this Court to overrule *Illes*, writing: "Despite the doctrine of stare decisis, the Sixth Circuit's decision was ill-considered and must be overruled." Appellant's Br. 58 (formatting omitted). His request is not well-made. Stare decisis is more than a principle in the Sixth Circuit, it is the rule. "A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).

Next, Kerman asserts that the CARDS transaction has substance because, "despite the IRS expert's erroneous testimony, CARDS generated a profit for the Kermans in 2001." Appellant's Br. 63. He does not elaborate on how he earned a profit on the CARDS transaction. And independent review of the record reveals no evidence supporting his assertion. He did, as noted, earn a little more than $60,000 in interest on

the loan. But this was substantially outweighed by the cost of the loan — more than $600,000. As noted, apart from the tax benefits, Kerman's CARDS transaction generated a loss of more than half a million dollars.

Finally, Kerman argues that the tax court's economic substance determination should be reversed because the tax court judge "entirely bypassed his [*Daubert*] gatekeeping obligations" and admitted the expert report of Kolbe. Appellant's Br. 64.

Contrary to Kerman's contention, the tax court did not abuse its discretion in admitting Kolbe's report. Rather than "bypassing" its gatekeeping obligation, the court lingered over the threshold determination of whether to admit the report. It permitted Kerman extended voir dire of Kolbe. It then heard argument on the admissibility of the report. Only then did the court overrule Kerman's objection to the admission of the report, explaining in part: "I do think it's consistent with the type of economic analysis that's generally admitted in analyzing, from an objective perspective, the rationale for want of a better word, of taxpayers entering into transactions similar to this."

This conclusion was reasonable. Kerman's counsel made no objection to Kolbe being "admitted as an expert in the area of financial economics in order to provide expert testimony to assist the Court." In the report, Kolbe endeavors to "undertake four specific tasks": (1) "review the transactions at issue in this dispute from an economic perspective"; (2) "analyze the risk-return characteristics of the various transactions"; (3) "assess the economic rationality of what is known about the non-tax business purposes for these transactions"; and (4) "assess the economic rationality, before and after tax considerations, of the decision by [Kerman] to engage in these transactions."

To take just one example, Kolbe compares the net present values of ordinary loans at market rates against Kerman's loan. He first observes that because of HVB's collateral requirements, there was minimal risk of default on the loan. He then finds that after the transaction costs are taken into account, the effective interest rate on the loan "is just under 70 percentage points (7,000 basis points) above the market rate." This type of economic analysis — calculating the actual cost of financing and comparing it against the market rate — "both rests on a reliable foundation and is relevant to the task

at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see generally* 14 *Mertens Law of Federal Income Taxation* § 50:122 (West 2012) (discussing expert witness testimony in tax cases). Kerman's contention that the court "abdicated" its *Daubert* obligations lacks merit. Appellant's Br. 64.

Because the CARDS transaction lacked economic substance, the tax court's decision disallowing Kerman's deduction is affirmed.

III

A

The tax court's legal conclusions, including its decision to impose a gross valuation misstatement penalty, are reviewed de novo. *Estate of Kluener v. Comm'r*, 154 F.3d 630, 637 (6th Cir. 1998). Its factual findings, including its decision that Kerman did not act with reasonable cause and in good faith in claiming the deduction, are reviewed for clear error. *Id.* at 634 (citing *Owens v. Comm'r*, 568 F.2d 1233, 1237–38 (6th Cir. 1977)). A finding is clearly erroneous only if the record as a whole leaves the reviewing court "with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (internal citation and quotation marks omitted) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

B

Section 6662 of the Internal Revenue Code imposes an accuracy-related penalty for the underpayment of tax attributable to the taxpayer misstating his basis in property.

First, subsection (a) provides: "If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment." 26 U.S.C. § 6662(a).

Subsection (b), in turn, specifies that the penalty "shall apply to the portion of any underpayment which is attributable to," among other things, "[n]egligence or disregard of rules or regulations," "[a]ny substantial understatement of income tax," or "[a]ny substantial valuation misstatement under chapter 1." § 6662(b)(1)-(3).[8]

Both "substantial understatement of income tax" and "substantial valuation misstatement under chapter 1" are defined terms. § 6662(d), (e). A "substantial understatement of income tax" occurs when "the understatement for the taxable year exceeds the greater of — (i) 10 percent of the tax required to be shown on the return for the taxable year, or $5,000." § 6662(d)(1)(A).

A "substantial valuation misstatement under chapter 1" occurs when a taxpayer overstates the basis in property by "200 percent or more of the amount determined to be the correct amount of such valuation." § 6662(e)(1) (2004).[9]

Finally, subsection (h) doubles the penalty to 40 percent of the portion of the underpayment for "gross valuation misstatements" — when a taxpayer overstates the basis in his or her property by 400 percent or more. § 6662(h)(a)(i) (2004).

The plain language of this section "speaks in mandatory terms — the valuation misstatement penalty 'shall be added' 'to any portion of an underpayment of tax required to be shown on a return . . . which is attributable to . . . [a]ny substantial valuation misstatement' or 'gross valuation misstatement.'" *Gustashaw v. Comm'r*, 696 F.3d 1124, 1136 (11th Cir. 2012) (quoting §§ 6662(a), (b)(3), (h)(1)); *see generally* Richard J. Wood, *Accuracy-Related Penalties: A Question of Values*, 76 Iowa L. Rev. 309 *passim* (1991) (discussing the enactment of § 6662 and its statutory predecessor, § 6659).

---

[8]Even if the IRS determines that multiple accuracy-related penalties are appropriate for a particular underpayment of tax, the treasury regulations provide that the penalties may not be stacked — only one may be imposed. 26 C.F.R. § 1.6662–2©; *see Gustashaw v. Comm'r*, 696 F.3d 1124, 1135 (11th Cir. 2012).

[9]As amended, § 6662(e) now provides that the substantial valuation penalty applies when the basis is overstated by 150 percent or more.

Section 6664(c)(1), however, offers "a narrow exception to the imposition of accuracy-related penalties." *Gustashaw*, 696 F.3d at 1135 (citing § 6664(c)(1)). Titled the "reasonable cause exception," it provides: "No penalty shall be imposed under [§ 6662] with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." § 6664(c)(1).

"The determination of whether a taxpayer acted with reasonable cause and in good faith," the treasury regulations elaborate, "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R. § 1.6664-4(b)(1). The regulations continue:

> Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer.

*Id.* But, the regulations caution, "Reliance on an information return or on the advice of a professional tax advisor . . . does not necessarily demonstrate reasonable cause and good faith." *Id.*

1

Presently, the federal courts of appeals are divided over whether a transaction disallowed for lack of economic substance is subject to the penalty provisions of § 6662. The Sixth Circuit is in the majority — when a deduction is disallowed "due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject to the penalty under [ § 6662]." *Illes*, 982 F.2d at 167 (6th Cir. 1992) (quoting *Massengill v. Comm'r*, 876 F.2d 616, 619–20 (8th Cir.1989)). This approach is also followed by, among others, the First, Second, Third, Fourth, Eighth, and Federal Circuits. *See id.*; *Gustashaw*, 696 F.3d at 1136; *Alpha I, L.P., ex rel. Sands v. United States*, 682 F.3d 1009, 1026–31 (Fed. Cir. 2012); *Fidelity Int'l Currency Advisor A Fund, LLC, ex rel. Tax Matters Partner v. United States*, 661 F.3d 667, 671–75 (1st Cir.

2011); *Merino v. Comm'r*, 196 F.3d 147, 155, 156–59 (3d Cir. 1999); *Zfass v. Comm'r*, 118 F.3d 184, 190–91 (4th Cir. 1997); *Gilman v. Comm'r*, 933 F.2d 143, 149, 151 (2d Cir. 1991).  The Fifth and Ninth Circuits, in contrast, do not apply the §6662 penalty to deductions disallowed due to lack of economic substance.  *Gainer v. Comm'r*, 893 F.2d 225, 227–29 (9th Cir. 1990); *Todd v. Comm'r*, 862 F.2d 540, 542–45 (5th Cir. 1988).

The reason for the majority rule is straightforward.  Parity.  As the First Circuit explains, "it would be perverse to allow the taxpayer to avoid a penalty otherwise applicable to his conduct on the ground that the taxpayer had also engaged in additional violations that would support disallowance of the claimed losses."  *Fid. Int'l Currency Advisor*, 661 F.3d at 673 (citing *Gilman*, 933 F.2d at 150); *see also Gustashaw*, 696 F.3d at 1136 ("This rule rests upon the fact that the abusive tax shelter is built upon the basis misstatement, and the transaction's lack of economic substance is directly attributable to that misstatement."); *see generally Helvering v. Mitchell*, 303 U.S. 391, 399 (1938) ("To ensure full and honest disclosure, to discourage fraudulent attempts to evade the tax, Congress imposes sanctions.").

2

Kerman claimed that the $784,750 in foreign currency (€855,000) that he purchased pursuant to the CARDS transaction had a basis of $5 million, and claimed an ordinary loss deduction of $4,251,389 on his 2000 tax return.

This claimed deduction lacked economic substance.  Kerman's actual basis in the currency is what he purchased: $784,750.  His reported basis was $5 million, an overstatement of 530 percent.  So the "gross misevaluation" penalty of § 6662(h)(1) presumptively applies,  unless he is able to establish that overstatement falls within the "reasonable cause exception" of § 6664(c)(1).  And this he does not do.

a

The tax court's finding that Kerman did not act with reasonable cause, as noted, may only be reversed if clearly erroneous.  *Mortensen v. Comm'r*, 440 F.3d 375, 385

(6th Cir. 2006); *accord Am. Boat Co., LLC v. United States*, 583 F.3d 471, 483 (7th Cir. 2009).

The tax court found that Kerman did not act with reasonable cause for several reasons. First, the CARDS promotional materials themselves "warn that the IRS might challenge the transaction, and that the tax law requires taxpayers to possess a business purpose and a transaction to have economic substance to be respected for federal income tax purposes."

The record bountifully supports the tax court's conclusion that Kerman's claimed business purposes for entering the transaction were "not credible." To take just one example, the court did not credit Kerman's claim that one of his "business purposes for the CARDS transaction was to borrow euro at a low rate to conduct business in Europe and to serve as a low risk hedge to overseas transactions." The court observed that Kerman exchanged the euro for dollars almost as soon as they were credited to him. Indeed, this exchange was essential to the CARDS transaction. No exchange, no realization event. And no tax benefit.

b

Next, the tax court observed that included in the CARDS promotional materials was a copy of IRS Notice 2000-44, which cautions "that tax losses from transactions similar to CARDS that are designed to produce noneconomic tax losses by artificially overstating basis are not allowable as deductions for Federal income tax purposes." The CARDS promotional materials also explained that in a CARDS transaction "the taxpayer claims a tax loss . . . even though the taxpayer has incurred no corresponding economic loss." Under the circumstances, the tax court found, "Mr. Kerman knew or should have known that the CARDS transaction was just too good to be true." This is, of course, simply common sense. Being promised something for nothing — tax benefits without economic cost — should give a reasonable person pause.

c

Additionally, the court found that Kerman did not reasonably investigate the CARDS strategy's legitimacy before, during, or after the CARDS transaction. The court observed: "Mr. Kerman testified that he had no knowledge or understanding of the CARDS transaction. He did not read, review, or remember the documents executed as part of the CARDS transaction. He was either not familiar with or had only a superficial recollection of . . . Chenery, Colindale, and HVB and its affiliates."

Addressing the Ruble opinion, for example, the court found that even if Kerman had read the opinion (he testified that he had not), no reasonable reliance could be placed in it. Before Kerman entered into the CARDS transaction, the court observed, Chenery employees assured Kerman that he "would receive a tax opinion from Brown & Wood . . . . [Kerman] knew that Mr. Ruble and Brown & Wood were working together with the CARDS promoters. [Kerman] also knew, or should have known, that the Brown & Wood opinion was not independent advice." *Id.* at 18. The opinion itself, the court observed,

> contains several misstatements, and [Kerman] admitted that the representations in the tax opinion are false and fraudulent. It states that the assets were released to [Kerman] when [he] purchased them and that [Kerman] provided substitute collateral. As discussed above, [Kerman] never received any of the loan proceeds and never substituted collateral. Additionally, the tax opinion states that petitioners sold the assets on December 28, 2000, even though they actually exchanged portions of the euro on December 22 and 27, 2000. The tax opinion states that [Kerman] represented that [he] had reviewed the transaction summary in the tax opinion and that it was "accurate and complete." However, Mr. Kerman testified that he never reviewed the transaction summary.
>
> . . .
>
> Mr. Kerman [also] represented that he reasonably believed that the assets, or the proceeds from the sale, could be used to generate a return that would exceed "by more than a de minimis amount the all-in cost of borrowing," including fees and costs paid to third parties "and without regard to Federal income taxes." However, as discussed above, he had no purpose to use the loan proceeds, so this representation is false.

Crucially, the court noted, "The tax opinion concludes with a statement that Brown & Wood did not independently verify the representations and documents for the CARDS transaction; and if they were inaccurate in any material respect, the tax opinion could not be relied upon." Moreover, the court continued, "Mr. Kerman admitted that he did not select Brown & Wood as the law firm to provide the tax opinion and that he had met neither Mr. Ruble nor any attorney at Brown & Wood. There is no evidence showing that [Kerman] had an engagement letter with, directly paid any fees to, or ever spoke to anyone at Brown & Wood." Under the circumstances, the court concluded that Kerman could not claim that he had a reasonable, good faith belief in the CARDS transaction's bona fides because of the Ruble opinion. The court's finding is not clearly erroneous.

Turning to the advice that Kerman claimed that he received from his personal accountant, Gibbs, and his firm, Roth & Co., the court noted "Although [Kerman] claimed to have relied on advice from Mr. Gibbs and Louis T. Roth & Co., the accounting firm, neither provided [Kerman] with a written tax opinion for the CARDS transaction." Any oral advice that Gibbs gave, the court wrote, also could not be relied on because Kerman "did not provide necessary and accurate information to him." Elaborating, the court continued:

> This is evidenced by the fact that Mr. Gibbs did not know the most basic facts about [Kerman's] CARDS transaction, such as the amount of U.S. dollars [Kerman was] credited with when the €855,000 was exchanged. Instead of fully disclosing the facts concerning the CARDS transaction to Mr. Gibbs, Mr. Kerman testified that he did not know but assumed that Mr. Gibbs saw the CARDS transaction documents. Mr. Gibbs evidently relied on the promotional materials and [the Ruble] opinion[.]

Similarly, while Shields testified that he spoke with Ruble and Goodman about several of the CARDS transaction documents, he admitted that they merely discussed that the various documents were consistent with the transaction as presented to him. The court therefore found that any reliance on Shield's advice would not demonstrate that Kerman acted with reasonable cause and in good faith.

Taking into account the record as a whole, it cannot be said that the tax court's finding was clearly erroneous. Rather, the record contains ample evidence that Kerman

neither had reasonable cause nor a good faith belief that CARDS was a bona fide transaction.

C

Against this conclusion, Kerman makes several arguments. Again, none are persuasive. First, he argues that the tax court applied the wrong statutory subsection — and the wrong version of the subsection at that. He writes:

> Most egregiously, the Kermans' right to take existing tax-shelter and penalty legislation as they found it in 2001 when their return was filed, was disregarded. The Tax Court instead applied a post-2003 version of § 6662, which had substantively different tax-shelter transaction penalty criteria. In turn, this misapplication resulted in a misguided "valuation overstatement" penalty.

Appellant's Br. 24. In essence, he is arguing that the court erred in applying the "valuation misstatement" provision of subsection (e) — he thinks that the court should have applied the "understatement of income tax" provision of subsection (d).

To his credit, Kerman acknowledges that this Court's decision in *Illes* is to the contrary. As noted, this Court has held that when a deduction is disallowed "due to lack of economic substance, the deficiency is attributable to overstatement of value." *Illes*, 982 F.2d at 167. That is, subsection (e) applies.

But, Kerman argues, it shouldn't. In support of his proposition, he cites the decisions of the Fifth and Ninth Circuits that are contrary to *Illes* and asks this Court to overturn that decision. Appellant's Br. 58-61 (discussing *Gainer v. Comm'r*, 893 F.2d 225, 227 (9th Cir. 1990); *Todd v. Comm'r*, 862 F.2d 540, 542–45 (5th Cir. 1988)). He proposes that this Court adopt the following rule: "[I]f a deduction or credit is entirely disallowed, a taxpayer cannot be penalized for the valuation overstatement included in that deduction." Appellant's Br. 52 (emphasis omitted). Kerman's argument lacks merit.

As noted, stare decisis is the rule in the Sixth Circuit. And even if it weren't, Kerman's proposal would still be unsound.

The "valuation misstatement" penalty of § 6662(e) is specifically targeted at tax shelters. *See Rose v. Comm'r*, 88 T.C. 386, 425 (1987), *aff'd* 868 F.2d 851 (6th Cir. 1989) (observing that Congress's intent that penalties be applied in tax shelter cases is "particularly true to the extent that tax motivated transactions . . . include 'any valuation overstatement' "); *see generally* Wood, *supra*, at 310 (noting the valuation provisions were historically a battle against tax shelters); Kathleen O. Lier, *The Evolution in Tax Shelter Litigation: The Tax Court Closes the Door on Generic Tax Shelters, but A Window Remains Open with Respect to the Additions to Tax and the Increased Interest Under I.R.C. § 6621 (c)*, 36 Loy. L. Rev. 275, 310 (1990) ("As valuation is a major element in tax shelters and plays a part in the resolution of numerous shelter issues, such as profit motive, economic substance, the existence of a genuine indebtedness, etc., it would be more logical for the court to address the valuation rather than collateral and alternative issues."). Judge Gerber explains:

> Valuation is one of the major devices used in abusive tax shelters. It is the value inherent in an asset that will imbue a transaction with economic substance. . . . The difference between abusive and nonabusive shelters is that the value of the assets are so grossly inflated as to remove any possibility of economic profit. The fundamental issue in these cases generally will be whether the property has been "acquired" at an artificially high price, having little relation to its fair market value.

*McCrary v. Comm'r*, 92 T.C. 827, 863 (1989) (quotation marks omitted) (Gerber, J., dissenting) (quoting *Estate of Franklin v. Comm'r*, 544 F.2d 1045, 1046 n.1 (9th Cir. 1976)); *see generally* Kathleen DeLaney Thomas, *The Case Against A Strict Liability Economic Substance Penalty*, 13 U. Pa. J. Bus. L. 445, 450 (2011) ("Although neither the statute nor the legislative history of the valuation misstatement penalty uses the phrase 'tax shelter,' both commentators and courts have viewed the penalty as a direct response to the tax shelter problem.").

Valuation is at the core of the CARDS strategy. It claims that the value of the loan is not the fractional share of the proceeds actually received, but the grand total of the loan. The issue, of course, is whether the property was acquired at an artificially high price. For reasons discussed above, it was. The tax court did not err in applying

the valuation misstatement penalty of § 6662(e) (as enhanced by gross misstatement enhancement of subsection (h)) rather than the substantial understatement penalty of § 6662(d).

Next, Kerman argues that if the Court confines its analysis to the "substantial understatement" penalty of § 6662(d), the tax court's decision must be reversed because "substantial authority" existed in 2000 that the CARDS transaction would more likely than not be upheld. Appellant's Br. 37–43. Cautioning against hindsight bias, he writes: "[I]t is tempting to view a 2000 CARDS transaction with the benefit of 20/20 hindsight; this approach is profoundly flawed and for the Kermans resulted in a significant reversible error. CARDS was not a listed transaction until March of 2002." Appellant's Br. 31. Again, the argument lacks merit.

First, as noted, the tax court did not err in applying the valuation misstatement penalty rather than the substantial understatement penalty. Therefore, the issue is not whether substantial authority existed for the CARDS transaction. Rather, the question is whether Kerman had "reasonable cause" for the misstatement and "acted in good faith." 26 U.S.C. § 6664(c)(1).[10] The presence of "substantial authority" may be relevant to this inquiry — the more substantial the authority justifying Kerman's actions, the more reasonable they would be. But substantial authority is not sufficient under the statute.

Second and similarly, that CARDS was not officially a "listed transaction" until 2002 is relevant — but is again not sufficient — to demonstrate that Kerman acted with reasonable cause and in good faith. Simply because the IRS had not yet specifically identified CARDS as a sham transaction in 2000 does not mean that Kerman had reasonable cause to believe that it would more likely than not be upheld as legitimate. As detailed above, there is ample evidence in the record that he could not have

---

[10]As noted, § 6664(c)(1) provides: "No penalty shall be imposed under [§ 6662] with respect to any underpayment if it is shown that there was reasonable cause for such underpayment and that the taxpayer action in good faith with respect to such portion."

reasonably thought that it would.  For example, he knew or should have known that there was no legitimate non-tax reason to enter into the transaction.

Against this conclusion, Kerman argues: "Though, admittedly, the Kermans did not personally scrutinize the transaction, as discussed in detail above, Kenmark's CFO, who was also a CPA, and both the Kermans' long-time CPA and their tax lawyer did so extensively.  Nevertheless, Judge Goeke utterly ignored this significant testimony, instead relying on the testimony of Bruce Cohen, a self-proclaimed habitual liar." Appellant's Br. 21-22 (quotation marks omitted).  Essentially, Kerman asks this Court to find his testimony more credible than Cohen's.

Courts of appeal, however, are not designed for credibility-weighing.  As the Supreme Court explains, "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Bessemer City*, 470 U.S. at 575.  Of course, the Court cautions, "factors other than demeanor and inflection go into the decision whether or not to believe a witness.  Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.  Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." *Id.*

Kerman, however, points to no such objective evidence.  Rather, the documentary evidence reinforces rather than undermines the tax court's finding.  To take just one example, HVB kept a spreadsheet listing the "desired loss" for their CARDS customers, including Kerman.  For Kerman, the spreadsheet listed a desired loss of $4,250,000.  Chenery promised this tax loss would have "no corresponding economic loss."  One does not have to be a tax expert to know that imaginary losses will be greeted with skepticism by the IRS.  A reasonable person would have been on notice that the CARDS transaction lacked economic substance.

Finally, Kerman argues, the tax court gave him too much credit.  He's just a simple man, "utterly uneducated in the complex tax arena — let alone the more

byzantine tax-shelter realm." Appellant's Br. 48.  Consequently, he was forced to rely on personal advisors.  And, he argues, his reliance was reasonable even if his advisors had conflicts of interest.  He notes that "not until 2004 did the Code prohibit the use of tax opinions from non-independent tax advisors to meet the 'reasonable belief that the tax treatment was more likely than not proper' safe-harbor . . . .  Stated differently, not until 2004 — three years after [his] tax return was filed — did Congress legislate against non-independent tax opinions."  Appellant's Br. 19-20 (emphasis omitted).  Kerman's argument is unpersuasive.

Simply because the Code did not prohibit the use of opinions from non-independent tax advisors until 2004 does not mean that using such opinions was necessarily reasonable.  The quality of advice depends on its objectivity.  Kerman's reliance on advisors that he knew or should have known had a conflict of interest was not reasonable.

IV

We affirm.