NICOLE ROSE CORP., formerly known as *Quintron Corporation,* Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Docket No. 02–4110.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 2002.

Decided Dec. 13, 2002.

Publication Ordered: Feb. 24, 2003.

Robert F. Denvir, Winston & Strawn (James M. Lynch, Peter W. Poulos, David L. Theyssen, on the brief), Chicago, IL, for Petitioner–Appellant.

Thomas J. Sawyer, Tax Division, Department of Justice (Eileen J. O'Connor, Assistant Attorney General, Teresa E. McLaughlin, on the brief), Washington, DC, for Respondent–Appellee.

Before: WALKER, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

PER CURIAM.

Petitioner-appellant Nicole Rose Corp.[1] ("Rose") appeals from the December 28, 2001 decision of the United States Tax Court finding deficiencies of $1,171,365, $684,700, and $4,559,237 for 1992, 1993, and 1994, respectively and imposing penal-

---

1. We refer to Petitioner Nicole Rose Corp. by its current name throughout, including in connection with transactions that were con- ducted under its prior names, QTN Acquisitions and Quintron.

ties totaling $1,283,060, pursuant to 26 U.S.C. § 6662(a). On appeal, Rose argues that the tax court erred because it disregarded the real economic effects of the transfer of lease interests and the pre-tax profit earned by Rose through the disputed transactions. We affirm.[2]

The dispute between the Commissioner of Internal Revenue ("Commissioner") and Rose concerns approximately $22 million in claimed business expense deductions. Rose maintains that the business expenses arose from the transfer of Rose's interest in certain leases of European computer equipment. The leases originated when Brussels Airport purchased computer equipment from ABN, a commercial Dutch bank, and then leased the equipment back to ABN for a term extending from 1990 until December 31, 1997. The Brussels Airport financed this purchase with a loan from Pierson, Heldring & Pierson, N.V. ("Pierson"), a subsidiary of ABN. Rather than pay Brussels Airport under the leaseback, ABN paid Pierson. In 1991, ABN assigned its interest under the lease to Atrium Finis ("Atrium"), a British firm; Atrium then subleased the equipment back to ABN for three years with the option to extend the leaseback for an additional four years. ABN prepaid to Atrium approximately $25 million, 90 percent of the amount due over the six-year term of the original Brussels Airport lease. This $25 million was placed in a trust fund to secure Pierson's right to repayment on its loan to Brussels Airport. Pierson, not Atrium, was both beneficiary and trustee of the trust fund and had no recourse against Atrium for payments on the loan to Brussels Airport. Atrium was required to make additional payments of approximate-

ly $1.6 million to cover the remaining ten percent due on the Brussels lease.

In September of 1993, Rose's director, Douglas Wolf, assisted in the renegotiation of some of the terms of the payments due under the Atrium–ABN leaseback. In particular, the additional $1.6 million owed by Atrium to Pierson was reduced to $400,000 and ABN agreed to continue subleasing the equipment from Atrium for the four-year renewal period of the sublease. On September 30, 1993, the parties restructured ABN's lease payments during the renewal period in a residual value certificate ("RVC") under which ABN would pay Rose on November 30, 1996 and November 30, 1998, 200 percent of the equipment's fair market value in excess of $5 million on the first date and in excess of $2 million on the second date. The tax court found that no credible effort was made to establish whether the base amounts were reasonable and whether the RVC had any foreseeable value.

At some point prior to September 29, 1993, Atrium transferred its rights and obligations relating to the underlying Brussels leaseback, the Atrium sublease, and the trust fund to companies controlled by Douglas Wolf. On September 30, 1993, Wolf transferred these interests to Rose. Rose immediately transferred its interest in the Brussels leaseback to Handelsmaatschapij Wildervank, a Dutch bank, along with $400,000 in cash and ten shares of stock in Cove Enterprises, Inc., an unrelated corporation. Rose retained its interest in the RVC but never tried to determine the value of the leased equipment.

Rose claimed a loss of approximately $22 million on the transaction with Wildervank. This loss was based on the transfer

**2.** Our decision on this appeal originally appeared in an unpublished summary order, issued on December 13, 2002. The government subsequently moved to have the decision published. Because we are persuaded that this decision may have some precedential value, we grant the motion and publish our disposition.

of the $400,000 in cash, a $2,118,644 capital loss from the transfer of the Cove stock, and an ordinary business expense of $21,840,660 from the transfer of Brussels Lease and the Trust Fund.

Rose applied the claimed $22 million business deduction to income generated through Rose's purchase of Quintron Corp., a Virginia corporation, and the sale of substantially all of Quintron's assets. In September 1993, Rose had purchased all the shares of Quintron, merged into Quintron, and immediately sold Quintron's assets to Loral Aerospace Corp., generating $11 million in income. Rose then used the claimed $22 million deduction from the lease transfer to offset this $11 million in taxable income, resulting in no tax, and also carried back the remaining loss to Quintron's 1992 and 1993 tax years, thereby offsetting Quintron's income from those years and generating tax refunds of $1,172,448 and $684,705, respectively.

██ The tax court determined that Rose entered into the lease sale transaction with Atrium solely for the purpose of tax avoidance and that the transaction lacked economic substance, and, therefore, was without effect for Federal income tax purposes. A transaction is a sham "if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions." *DeMartino v. Comm'r,* 862 F.2d 400, 406 (2d Cir.1988); *see also Gilman v. Comm'r,* 933 F.2d 143, 147 (2d Cir.1991).

██ Rose contends that the tax court erred because the lease transfer to Wildervank resulted in a change in Rose's assets and legal obligations and therefore had real economic effects. In particular, Rose argues that the transaction terminated its obligations under the lease and entitled it to the possibility of a future payment under the RVC. The tax court found, however, that, based on the testimony of the Commissioner's expert, the transaction "lacked business purpose and economic substance." Whether a transaction lacks economic substance is a question of fact that we review under the clearly erroneous standard. *See Lee v. Comm'r,* 155 F.3d 584, 586 (2d Cir.1998).

We cannot say that the tax court's finding that the transaction lacked economic substance was clearly erroneous. Because the trust fund was controlled by and was for the benefit of Pierson, Rose did not have a significant interest in the contents of the fund. Nor did Rose have a significant interest in the computer equipment sublease, which it had immediately leased back to ABN for the duration of the sublease. Finally, testimony before the tax court showed that the parties lacked information on the value of the computer equipment and made no attempt to value the equipment on the RVC payment dates.

Rose's second argument on appeal is that there was economic substance because Rose earned a pre-tax profit on the transaction "which included the Quintron stock purchase and asset sale and the transfer of the lease interests and cash to Wildervank." This argument is meritless. The relevant inquiry is whether the transaction that generated the claimed deductions—the lease transfer—had economic substance. Income generated through the Quintron purchase and asset sale is irrelevant to this inquiry. We therefore affirm the tax court's decision rejecting the claimed $22 million tax deductions.

██ Finally, Rose argues that the tax court erred in imposing accuracy-related penalties under 26 U.S.C. § 6662 because Rose had reasonably relied on qualified advisors concerning an issue of first impression. The tax court rejected this argument below finding that the scheme was so clear and obvious that the participation

of professionals could not shelter Rose from the penalties. We review the tax court's finding for clear error. *Goldman v. Comm'r,* 39 F.3d 402, 406 (2d Cir.1994). We agree that Rose's scheme was sufficiently blatant that the participation of experts cannot convert its actions into a "reasonable attempt to comply with the provisions" of the tax code. 26 U.S.C. § 6662(c). We therefore affirm the imposition of penalties.

For the reasons set forth above, we affirm the judgment of the tax court.