**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2402**

GUY R. BAXTER; LONNIE C. BAXTER,

Petitioners – Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,

Respondent – Appellee.

Appeal from the United States Tax Court.  (Tax Ct. No. 016835-08)

Argued:  October 31, 2018                         Decided:  December 7, 2018

Before KING, DUNCAN, and WYNN, Circuit Judges.

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge King and Judge Duncan joined.

**ARGUED:**  David Decoursey Aughtry, CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, Atlanta, Georgia, for Appellants.  Jennifer Marie Rubin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Jasen D. Hanson, CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, Atlanta, Georgia, for Appellants.  Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Gilbert S. Rothenberg, Arthur T. Catterall, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

WYNN, Circuit Judge:

Taxpayers Lonnie Curtis Baxter ("Ms. Baxter") and her husband Guy R. Baxter (collectively, with Ms. Baxter, "Taxpayers") appeal an opinion and decision of the United States Tax Court imposing back taxes and penalties attributable to Taxpayers' use of what appellee Commissioner of Internal Revenue (the "Commissioner") deemed to be an unlawful tax shelter. *See Curtis Inv. Co., LLC v. Comm'r*, 114 T.C.M (CCH) 141, 2017 WL 3314283 (2017). On their 2000 tax return, Taxpayers claimed substantial capital losses attributable to a Custom Adjustable Rate Debt Structure ("CARDS") transaction, which Taxpayers relied on to offset capital gains attributable to the sale of their family business. The Commissioner argued—and the Tax Court agreed—that the CARDS transaction lacked "economic substance" and therefore that the Taxpayers improperly relied on the transaction to offset their capital gains. After careful review, we affirm the Tax Court's order and decision in its entirety.

I.

A.

Ms. Baxter is the great-granddaughter of Henry Russell Curtis, the founder of American Business Products, Inc. ("ABP"), a successful printing company. Prior to the transactions giving rise to the present dispute, Ms. Baxter directly held several shares of ABP stock. In 1961, the family formed Curtis Investment Company, LLC ("Curtis Investment"), to hold the family's ABP stock as well as to engage in other investments. Ms. Baxter also held a beneficial interest in ABP stock by virtue of her ownership interest in Curtis Investment. In 1986, Ms. Baxter became the managing member of Curtis

2

Investment. Ms. Baxter's son, Henry J. Bird ("Bird"), succeeded Ms. Baxter as managing member of Curtis Investment in 1998, and formed an investment committee— on which Ms. Baxter continued to serve—to oversee Curtis Investment's investment strategy.

In late February 2000, Curtis Investment and Ms. Baxter sold their ABP stock as part of the sale of ABP. Ms. Baxter's sale of her ABP stock generated a $2,444,383 long-term capital gain and a $18,895 short-term capital gain. Faced with the prospect of a sizable tax bill attributable to this sale, Ms. Baxter and Curtis Investment's investment committee considered multiple approaches to sheltering the gain. One of Taxpayers' accountants, Barbara Coats, learned of the CARDS shelter and met with Roy Hahn, founder of Chenery Associates, Inc. ("Chenery Associates"), who marketed the CARDS shelter.

Coats and another accountant at her firm, Matt Levin, presented the CARDS transaction to Bird. Bird asked Coats and Levin and two lawyers, Thomas Rogers and Ann Watkins, to review the transaction and its promoters. To that end, the advisers hired a private investigator to investigate Chenery Associates and Hahn. As part of its CARDS package, Chenery Associates marketed a model tax opinion letter prepared by R.J. Ruble of Brown & Wood LLP, who also served as a reference for Hahn. Taxpayers' advisers spoke with Ruble on several occasions regarding the model opinion letter. After reviewing many, but not all, of the authorities cited in the letter, but without conducting additional research, Taxpayers' accountants "independent[ly]" advised the Taxpayers that they "thought the tax effects were as outlined in the tax opinion letter." J.A. 2914.

3

Neither Taxpayers' accountants nor their tax lawyers provided Taxpayers with separate opinion letters, however. Rogers walked through the tax effects of the CARDS transaction with Bird, who then conveyed his understanding of those effects to Ms. Baxter. Based on this review, Taxpayers decided to move forward with the CARDS transaction.

Taxpayers' CARDS transactions—like all CARDS transactions, *see Kerman v. C.I.R.*, 713 F.3d 849, 853 (6th Cir. 2013)—proceeded in the following stages: origination, assumption, operation, and unwinding, *Curtis Inv.*, 2017 WL 3314283, at \*4–6.

At the origination stage, two residents of the United Kingdom (and, therefore, not subject to U.S. tax law)—Elizabeth Sylvester and Michael Sherry—organized a Delaware, LLC: Caledonian Financial Trading, LLC ("Caledonian"). Sylvester and Sherry participated in a similar manner in several other CARDS transactions. On December 14, 2000, Caledonian entered into a credit agreement with Hypo-Und Vereinsbank, AG ("HVB")—a German bank that regularly facilitated CARDS transactions[1]—pursuant to which HVB loaned Caledonian €2.9 million. Caledonian's credit agreement with HVB had a 30-year term, but HVB retained the right to call the loan at the end of each year. Interest accrued annually at a rate equal to 12-month euro

---

[1] In 2006, HVB entered into a deferred prosecution agreement with the United States in which it admitted to facilitating several tax shelter transactions, including CARDS transactions, during the time it facilitated Taxpayers' CARDS transaction. *Gustashaw v. C.I.R.*, 696 F.3d 1124, 1132 (11th Cir. 2012). HVB further admitted "that the transactions had no purpose other than to generate tax benefits for the participants." *Id.*

4

LIBOR plus 0.5 percent. Under the credit agreement, the €2.9 million loan was more-than-fully collateralized—if Caledonian's collateral consisted of cash, the agreement obliged Caledonian to deposit 102% of its loan obligations with HVB, and if Caledonian's collateral consisted of other assets, the agreement obliged Caledonian to deposit assets valued at 108% of its obligations.

HVB deposited eight-five percent (85%) of the proceeds of the loan in an HVB time-deposit account with a one-year term that HVB established for Caledonian. Under the then-applicable dollar-to-euro exchange rate, eighty-five percent of the €2.9 million loan closely approximated Taxpayers' approximately $2.4 million expected capital gain from Ms. Baxter's sale of her ABP stock. HVB dispersed the remaining loan proceeds— which amounted to fifteen percent (15%) of the loaned funds—in the form of a one-year promissory note to Caledonian. Caledonian then pledged the promissory note and the time deposit—i.e. the *entire* proceeds it received from the loan—as collateral. Interest on both the time deposit and the promissory note accrued at a rate equal to 12-month LIBOR, meaning that interest accrued on the time deposit and the promissory note— Caledonian's entire proceeds from the loan—at a *lower* rate than Caledonian paid to borrow those proceeds (4.885% interest rate on time deposit and promissory note versus 5.335% interest on Caledonian loan). The loan agreement barred Caledonian from making withdrawals from its newly-form HVB account without providing substitute collateral. Caledonian further contracted not to request release of the collateral.

At the assumption stage, in late December 2000, Ms. Baxter acquired the promissory note HVB issued to Caledonian, which promissory note amounted to fifteen

percent (15%) of the loan proceeds. As part of her acquisition of the promissory note, Ms. Baxter further agreed to assume 100% of Caledonian's liability under its loan with HVB on a joint and several basis. The parties agreed that the funds in Caledonian's time deposit at HVB would serve as the first source of payment for Caledonian's obligations under the loan. On December 28, 2000, Ms. Baxter—who had no prior relationship with HVB—redeemed the promissory note she purchased from Caledonian, depositing €435,000 into a newly formed HVB account in her name. Ms. Baxter then asked HVB to change the denomination of the funds in her account from euros to dollars, at the then-applicable dollar-to-euro exchange rate of 0.924, yielding approximately $401,000.

Ms. Baxter further entered into a forward exchange contract with HVB, pursuant to which she was obligated to exchange approximately $442,000 for approximately €469,000 slightly less than one-year later, on December 14, 2001, the first-year call date for HVB's loan to Caledonian. That approximately €469,000 figure was nearly identical to the amount Caledonian, and therefore Ms. Baxter, would have to repay HVB if it exercised its contractual right to recall the loan after one year.

A taxpayer's currency exchange and note redemption are taxable events. Relying on Ms. Baxter's assumption of joint and several liability with Caledonian for 100% of the loan proceeds, Taxpayers claimed a $2,277,660 loss (€2.9 million in assumed liability less the €435,000 in loan proceeds she obtained, converted to dollars at the then-applicable exchange rate) on their 2000 tax return, offsetting nearly all their capital gain resulting from Ms. Baxter's sale of her ABP stock.

At the operational phase, Canadian Imperial Bank of Commerce ("CIBC")—with which Taxpayers had a long-standing relationship—issued to Curtis Investment a $6.7 million letter of credit, with a stated termination date of December 27, 2001. Pursuant to the terms of the agreement, Curtis Investment was obliged to keep at least $6.7 million in its accounts at CIBC, meaning that the letter of credit was fully collateralized. CIBC charged Curtis Investment $241,000 for the letter of credit. Ms. Baxter then substituted the letter of credit as collateral for Caledonian's loan—pledging to HVB a first priority lien and security interest in the letter of credit—and in return HVB dispersed $401,940 to Ms. Baxter. Notwithstanding that Taxpayers had business relationships with CIBC and several other banks before they considered engaging in the CARDS transaction, Taxpayers did not approach any of those banks about obtaining a loan.

Finally, the process to unwind the transaction began on November 13, 2001, when HVB notified Ms. Baxter of its intent to call its loan to Caledonian. Caledonian's time deposit at HVB covered most of the outstanding loan balance, with Ms. Baxter required to pay to HVB approximately €470,000 to retire Caledonian's loan. On December 14, 2001, pursuant to her forward exchange contract, Ms. Baxter exchanged approximately $442,000 for approximately €469,000, which she then applied against her obligation under the loan and assumption agreement. That exchange covered all but approximately €826 of Ms. Baxter's obligation to retire Caledonian's loan. Taxpayers unsuccessfully sought replacement loans from several other banks. Ms. Baxter paid Chenery Associates $154,375 in fees to facilitate her CARDS transaction. Put differently, aggregating

7

CIBC's and Chenery Associates' fees, the Tax Court found that Taxpayers paid approximately forty-five percent (45%) of the loan proceeds in fees.

B.

On April 8, 2008, the Commissioner issued a notice of deficiency to Taxpayers for tax years 2000 and 2001, asserting, *inter alia*, that Taxpayers could not claim a taxable capital loss deduction as a result of the CARDS transaction because, in the Commissioner's view, the transaction lacked economic substance. The Commissioner further stated that Taxpayers were liable for forty-percent accuracy-related penalties for making gross valuation misstatements. Taxpayers timely filed a petition with the Tax Court.

Following a four-day trial, during which the parties introduced lay and expert testimony and evidence, Tax Court Chief Judge L. Paige Marvel held that Ms. Baxter's CARDS transaction lacked "economic substance." *Curtis Inv.*, 2017 WL 3314283, at *9–12. In particular, the Tax Court found that the transaction did not provide Taxpayers "with a reasonable possibility of profit" and that Taxpayers' purported investment motive was "not credible." *Id.* at *10–11. The Tax Court further concluded that the Commissioner properly imposed the accuracy-related penalty because Taxpayers failed to show that there was a "reasonable cause" for their inaccurate claiming of the CARDS deduction or that Taxpayers took the deduction in good faith. *Id.* at *14–16. Taxpayers timely appealed.

II.

8

This Court reviews decisions of the Tax Court "on the same basis as decisions in civil bench trials in United States district courts." *Waterman v. Comm'r*, 179 F.3d 123, 126 (4th Cir. 1999). "Questions of law are reviewed de novo, and findings of fact for clear error." *Starnes v. C.I.R.*, 680 F.3d 417, 425 (4th Cir. 2012). On appeal, Taxpayers argue that the Tax Court (A) violated *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in considering and relying on an expert report prepared for and submitted by the Commissioner; (B) erred in finding that Taxpayers' CARDS transaction lacked "economic substance"; and (C) improperly found that Taxpayers failed to establish reasonable cause or good faith, and therefore erred by affirming the Commissioner's imposition of accuracy-related penalties.

A.

First, Taxpayers argue that the Tax Court violated *Daubert* by improperly considering an expert report and opinion by Dr. A. Lawrence Kolbe. We review the Tax Court's application of *Daubert* for abuse of discretion. *Cf. Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017) (reviewing district court's application of *Daubert* for abuse of discretion).

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify in the form of an opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." As part of its Rule 702 "gatekeeping" role, a trial court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "In *Daubert*, the Court announced five factors that

9

may be used in assessing the relevancy and reliability of expert testimony: (1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the 'existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." *United States v. Crisp*, 324 F.3d 261, 265–66 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593–94).

Kolbe, who works for an economics and management consulting firm and holds a Ph.D. in economics from Massachusetts Institute of Technology, offered a report and testimony concerning, among other topics: (1) the risk-return characteristics of Taxpayers' CARDS transaction to determine, objectively, "whether a reasonable possibility of profit existed apart from any tax benefit"; (2) "the economic rationality of what is known about the non-tax business purposes for these transactions"; and (3) the economic rationality, before and after tax considerations, of Ms. Baxter's decision to enter into the transactions. J.A. 300–01. After allowing voir dire and hearing argument, the Tax Court overruled Taxpayers' objection to admission of the report and Kolbe's testimony. Relying on standard financial calculations as well as historical data regarding then-applicable interest rates, Kolbe estimated the net present value of Ms. Baxter's loan obtained through the CARDS transaction, opining that, as a result of the high up-front fees, the net present value was "at least €2.19 million *less* than it would have been with a normal loan, taxes aside." J.A. 311. Kolbe further opined that due to the high borrowing costs, use of the loan "to purchase any investment would create a very material and

10

entirely unnecessary, drag on the profitability of that investment." J.A. 313–14. The Tax Court credited that analysis in its opinion. *Curtis Inv.*, 2017 WL 3314283, at \*10–12.

As they do with the Tax Court's economic substance analysis, *see infra* Part II.B, Taxpayers argue that the district court erred in admitting Kolbe's analysis because he improperly "segregat[ed] the finance costs from the investment returns on the loan proceeds." Appellants' Br. at 31. But it is within an economist's scope of expertise to opine that one can analyze the profitability of a loan by holding constant the likely returns to the proceeds of the loan, and then comparing the loan actually obtained with other available financing options—as Kolbe did here. As the Sixth Circuit held in rejecting a *Daubert* challenge to Kolbe's report in another CARDS case, "Kolbe['s] compar[ison of] the net present values of ordinary loans at market rates against [Taxpayers'] loan" is the "type of economic analysis—calculating the actual cost of financing and comparing it against the market rate—[that] 'both rests on a reliable foundation and is relevant to the task at hand.'" *Kerman*, 713 F.3d at 867 (quoting *Daubert*, 509 U.S. at 597). To that end, this Court and other courts have found similar net present value analyses admissible under *Daubert*. *See, e.g.*, *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 196 (4th Cir. 2017); *Tuf Racing Prods., Inc. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

Taxpayers also take issue with Kolbe's estimation of the costs to obtain a "good" or "normal" loan, which he used as a comparison point, because he did not use the "prime" interest rate or rely on interest rate data from the banks that provided the loan. But to the extent that Taxpayers' disagree with Kolbe's estimates of the costs of

11

obtaining a "good" or normal" loan, "such challenges . . . affect the weight and credibility of [Kolbe's] assessment, not its admissibility." *Bresler*, 855 F.3d at 196 (internal quotation marks omitted). The Tax Court did not abuse its discretion in rejecting Taxpayers' *Daubert* challenge.

## B.

Second, Taxpayers argue that the Tax Court reversibly erred in finding that the CARDS transaction lacked "economic substance" and, therefore, that Taxpayers unlawfully claimed losses attributable to the transaction to offset Ms. Baxter's gains from the sale of her ABS stock. "[U]nder the 'economic substance doctrine,' a transaction may be disregarded as a sham for tax purposes if the taxpayer [1] 'was motivated by no business purposes other than obtaining tax benefits' and [2] 'the transaction has no economic substance because no reasonable possibility of a profit exists.'" *BB&T Corp. v. United States*, 523 F.3d 461, 471 (4th Cir. 2008) (quoting *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir. 1985)). "[T]he first prong of the test is subjective, while the second is objective." *Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006). "Nevertheless, while it is important to examine both the subjective motivations of the taxpayer and the objective reasonableness of the investment, in both instances our inquiry is directed to the same question: whether the transaction contained economic substance *aside from the tax consequences*." *Id.* (emphasis added) (internal quotation marks and alterations omitted). "Whether under this test a particular transaction is a sham is an issue of fact" subject to clear error review. *Rice's Toyota*, 752 F.2d at 92.

1.

The first prong of the economic substance test "requires a [subjective] showing that the *only* purpose for entering into the transaction was the tax consequences." *Friedman v. C.I.R.*, 869 F.2d 785, 792 (4th Cir. 1989) (emphasis in original).

On appeal, Taxpayers assert that the Tax Court reversibly erred in finding that the transaction failed the subjective prong because record evidence demonstrates that Bird evaluated Curtis Investment's historical performance and determined, based on that performance, that even with the substantial fees payable to CIBC and Chenery Associates, the transaction would be profitable—over a thirty-year horizon—because Curtis Investment's historic annual return of 17.2 percent significantly exceeded the estimated 7.9 percent long-term annual "hurdle" rate for profitability. In support, Taxpayers point to a slide-show prepared by Bird and presented to Curtis Investment's investment committee, which listed only the CARDS transaction's investment benefits, not its tax benefits, although the tax benefits of the transaction were discussed at the meeting. And Taxpayers further note that Ms. Baxter testified that the investment aspect to the transaction was more important to her than the tax benefits and that she would have engaged in the transaction even absent the tax benefits.

But the Tax Court made several factual findings pertaining to Taxpayers' business purpose for engaging in the CARDS transaction adverting to and directly refuting these contentions. First, the Tax Court found that Taxpayers' claimed purpose of obtaining the loans so as to engage in leveraged investment was not credible in light of the extremely high fees and therefore the high costs of borrowing, which would constitute a long-term

13

drain on investment profitability. *Curtis Inv.*, 2017 WL 3314283, at \*10–11. Second, the Tax Court found that Taxpayers' claim that they expect the loan proceeds to be available for 30 years—which was essential to their expectation of profitability given that Taxpayers would pay the high fees up front—was not credible in light of the one-year terms for the time deposit, the promissory note, the letter of credit, and the forward currency exchange contract. *Id.* at \*12. Third, the Tax Court found that Ms. Baxter's testimony pertaining to her non-tax-avoidance purpose in engaging in the transaction was not credible. *Id.* at \*4 n.14. And, finally, the Tax Court found that Taxpayers were aware of the substantial tax liabilities associated with the sale of Ms. Baxter's ABP shares and considered several other tax shelters before choosing CARDS. *Id.* at \*12. Put differently, the Tax Court found that because the high-fees payable to Chenery Associates and CIBC during the first year of the transaction and the numerous transaction documents with one-year terms evidencing that HVB was likely to call the loan after one year—meaning that Taxpayers would incur all of the costs of the loan but obtain little of their anticipated benefits—Taxpayers' asserted reliance on the expected long-term profitability of the transaction was not credible.

These findings by the Tax Court are supported by facts in the record, and reflect reasonable inferences from those facts, and therefore are not subject to reversal under the applicable clear error standard of review. *See Rice's Toyota*, 752 F.2d at 94. And the Tax Court's credibility determinations, in particular, are entitled substantial appellate deference. *See Crispin v. C.I.R.*, 708 F.3d 507, 516 (3d Cir. 2013). That is particularly true given that this Court has recognized that the "'mere assertions'" of a "subjective

14

belief in the profit opportunity from [the] transaction 'particularly in the face of strong objective evidence that the taxpayer would incur a loss, cannot by itself establish that the transaction was not a sham.'" *Black & Decker*, 436 F.3d at 443 (quoting *Hines v. United States*, 912 F.2d 736, 740 (4th Cir. 1990)).

In addition to the facts expressly relied on by the Tax Court, this Court also has recognized that "promotion materials" distributed to market the tax consequences of a purported investment transaction can constitute strong evidence of intent when such materials evidence that the transaction was "designed as [a] tax avoidance transaction[]." *Friedman*, 869 F.2d at 793. And when a taxpayer "was in fact able to take large deductions as a result of h[er] transaction, just as the promotional materials had promised," that is particularly strong evidence of intent. *Id.*; *see also Hunt v. C.I.R.*, 938 F.2d 466, 472 (4th Cir. 1991) (relying on promotional materials as evidence of subjective intent); *Rice's Toyota*, 752 F.2d at 93 (same).

Here, Chenery Associates' promotional materials—which Taxpayers received— explicitly marketed the tax benefits of the CARDS transaction. *Kerman*, 713 F.3d at 865 (noting that the CARDS promotional materials stated that "the taxpayer claims a tax loss . . . even though the taxpayer has incurred no corresponding economic loss"). The key terms of the various transactions—including the amount of Caledonian's loan and the proportions of the loan proceeds allocated to the promissory note and the time deposit— were chosen to generate a loss that almost exactly approximated Ms. Baxter's anticipated gain from the sale of her ABP stock. And Taxpayers "t[oo]k large deductions . . . just as the promotional material had promised." *Friedman*, 869 F.2d at 793. Accordingly, the

Tax Court did not clearly err in finding that the subjective prong of the economic substance inquiry supported treating the transaction as a sham.

2.

The second prong of the economic substance test "requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from the tax benefits." *Rice's Toyota*, 752 F.2d at 94. At the outset, we point out that the Third and Sixth Circuits have considered CARDS transactions and *both* of those courts have persuasively concluded that the CARDS transaction lacked objective economic substance. *See Kerman*, 713 F.3d at 864–65; *Crispin*, 708 F.3d at 515. Likewise, Tax Court decisions universally hold that CARDS transactions lack objective economic substance. *See, e.g.*, *Kipnis v. Comm'r*, 104 T.C.M. (CCH) 530, 2012 WL 5271787, at *11 (2012); *Country Pine Fin., LLC v. Comm'r*, 98 T.C.M. (CCH) 410, 2009 WL 3678793, at *12–15 (2009).

In accordance with those decisions, the Tax Court found that Taxpayers' CARDS transaction failed the objective economic substance test. In rendering this finding, the Tax Court pointed to Kolbe's report as establishing that the transaction "lacked profit potential" because of the high fees and that the financing costs for the transaction, including those fees, "were substantially above market rates for comparable financing options." *Curtis Inv.*, 2017 WL 3314283, at *11. Additionally, the Tax Court found that Taxpayers "could have found less expensive financing options"—but never contacted other potential lenders, including banks with which they had existing relationships such as CIBC—and that the losses attributable to the high cost to finance the CARDS

16

transaction "would exist no matter what investment [Taxpayers] made with the proceeds because the same investments could have been financed by a more conventional type of loan." *Id.* at \*10–11. These findings, which find ample support in the record, were consistent with the reasoning in *Kerman* and *Crispin*. *See Kerman*, 713 F.3d at 865 ("[N]o credible business purpose for using such an expensive financing vehicle existed."); *Crispin*, 708 F.3d at 515 ("[T]here was no potential for profit, because the interest rate charged on the CARDS Loan was greater than the interest paid on the proceeds deposited as collateral at [the facilitating bank].").

Nevertheless, Taxpayers argue that the Tax Court committed legal error in conducting the objective prong analysis because the Tax Court disregarded Taxpayers' expected returns from investing the loan proceeds obtained through the CARDS transaction. According to Taxpayers, the Tax Court was required to consider the "whole undertaking"—i.e. Taxpayers' planned investment of the loan proceeds, not just the loan transaction itself, Appellant's Br. at 23—in determining whether "a reasonable possibility of profit from the transaction existed apart from the tax benefits," *Rice's Toyota*, 752 F.2d at 94. And Taxpayers again point to Bird's analysis and slide-show as showing that, even with the high-cost of financing, Bird expected the transaction to be profitable over the long-term if the proceeds of the loan appreciated in accordance with Curtis Investment's past performance.

In support of their position, Taxpayers cite a number of cases in which federal courts or the Tax Court used the terms "whole" or "entire" transaction in analyzing a federal tax question and argue that consideration of the "whole" transaction requires

17

looking at both the loan and the investments of the proceeds of the loan. *See* Appellant's Br. at 23–24 (citing, e.g.*, Comm'r v. Clark*, 489 U.S. 726, 738 (1989)). In response, the Commissioner notes that this Court and other Circuits have held that the economic substance inquiry "focuses *not* on the general business activities of [the taxpayer], but on the *specific transaction* whose tax consequences are in dispute." Appellee's Br. at 35 (quoting *Black & Decker*, 436 F.3d at 441 (emphasis added); citing, e.g., *Kearney P'ship. Fund, LLC v. Comm'r*, 803 F.3d 1280, 1295 (11th Cir. 2015)). Taken together, these two lines of authority simply beg the relevant question: what is the "transaction"— "specific" or "entire"—upon which a court must focus in conducting the economic substance inquiry?

As to that question, none of authorities relied by Taxpayers using the "whole" or "entire" transaction language dealt with the question at issue here: whether a court *must*— as Taxpayers argue—consider a taxpayer's expected profits from the use of loaned funds in determining whether the loan transaction lacked economic substance. By contrast, several of the cases cited by the Commissioner are somewhat more closely on point. For example, in *ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998), the Third Circuit considered a complex transaction through which Colgate-Palmolive Company ("Colgate") sought to offset substantial long-term capital gains incurred in the sale of one of its wholly-owned subsidiaries, *id.* at 234. Colgate joined and contributed capital to a partnership, ACM, with two banks, which partnership almost immediately thereafter invested its entire capitalization in $205 million in short term Citicorp notes. *Id.* at 239– 40. Within weeks, ACM sold $175 million of those notes in exchange "for $140 million

18

in cash plus LIBOR notes providing for a five-year stream of quarterly payments with a net present value of approximately $35 million." *Id.* at 240–41. Thereafter, ACM used the cash proceeds of the transaction to purchase more than $140 million in Colgate long-term debt. *Id.* By mid-1991, Colgate was the sole member of ACM by virtue of redemptions or Colgate's acquisition of the banks' partnership interests. *Id.* at 242. Due to rules related to the tax accounting of the streams of quarterly payments received in partial consideration for the sale of the $175 million in notes and Colgate's ultimate ownership of ACM, Colgate claimed a $84.5 million capital loss. *Id.* at 244.

Focusing on the *exchange of Citicorp notes for LIBOR notes* (i.e. ignoring the cash component of the sale of notes), the accounting for which transaction allegedly gave rise to the loss, the Third Circuit agreed with the Tax Court that the transaction lacked objective economic substance because "the transactions with respect to the Citicorp notes left ACM in the same position it had occupied before engaging in the offsetting acquisition and disposition of those notes." *Id.* at 250. Of particular relevance, the Third Circuit rejected ACM's (and therefore Colgate's) argument "that the Tax Court erred in excluding from its profitability analysis 'the pre-tax income resulting from the investment of $140 million of cash received as part of the consideration for the Citicorp Notes.'" *Id.* at 260 (quoting ACM's brief). The Third Circuit held the Tax Court properly disregarded those profits because they "did not result from the *contingent installment exchange* [i.e. the note exchange] whose economic substance is in issue" because that exchange "gave rise to the disputed tax consequences." *Id.* (emphasis added).

19

The Second Circuit reached a similar result in *Nicole Rose Corp. v. C.I.R.*, 320 F.3d 282 (2d Cir. 2003). There, a European airport purchased computer equipment from a Dutch bank, ABN, and then both directly, and by virtue of a series of sublease agreements, leased the equipment back to ABN. *Id.* at 283. One of the lessors then transferred its interest to taxpayer Nicole Rose Corp. ("Rose"), which in turn transferred that interest to a different Dutch bank, Wildervank. *Id.* Through all the assignments of the lessor interest, ABN continued as lessee of the equipment. *Id.* "Rose claimed a loss of approximately $22 million on *the transaction with Wildervank*," which Rose used to offset gains attributable to Rose's purchase of Quintron Corp. and subsequent sale of all Quintron's assets. *Id.* at 283–84 (emphasis added).

The Tax Court determined—and the Second Circuit agreed—that Rose's lease transfer transaction with Wildervank lacked economic substance, in part because Rose never had "a significant interest" in the computer equipment sublease. *Id.* at 284. In affirming that determination, the Second Circuit rejected as "meritless" Rose's argument that the transaction had "economic substance because Rose earned a pre-tax profit on the transaction 'which included the Quintron stock purchase and asset sale and the transfer of the lease interests and cash to Wildervank.'" *Id.* (quoting Rose's brief). "The relevant inquiry," the Second Circuit explained, "is whether the transaction that generated the claimed deductions—*the lease transfer*—had economic substance. Income generated through the Quintron purchase and asset sale is irrelevant to this inquiry." *Id.* (emphasis added).

20

*ACM* and *Rose* support the Commissioner's position because they establish that in assessing economic substance, the relevant transaction—be it characterized as "specific" or "entire"—is the transaction that gives rise to the gain or loss. In *ACM*, the relevant transaction was the exchange of notes, not the cash proceeds or the investment of the cash proceeds of the sale that accompanied the exchange of notes, even though that investment was part of the larger series of transactions at issue. In *Rose*, the relevant transaction was the lease transfer, not the Quintron purchase and sale agreements, even though the Quintron transactions had some connection to the lease transfer. Other courts have likewise focused on the transaction giving rise to the claimed gain or loss, not collateral transactions connected to the transaction but not giving rise to the gain or loss. *See, e.g.*, *Coltec Inds., Inc. v United States*, 454 F.3d 1340, 1356 (Fed. Cir. 2006) (holding that "the transaction to be analyzed is the one that gave rise to alleged tax benefit" and rejecting taxpayer's argument that economic substance test requires consideration of broader set of transactions); *Basic Inc. v. United States*, 549 F.2d 740, 745 (Ct. Cl. 1977) (refusing to consider downstream transaction in economic substance inquiry because "if such an explanation were sufficient then all manner of intermediate transfers could lay claim to 'business purpose' simply by showing some factual connection, no matter how remote, to an otherwise legitimate transaction existing at the end of the line").

Here, the particular transaction that gave rise to the loss is the assumption agreement pursuant to which Ms. Baxter agreed to be held liable for the eighty-five percent of Caledonian's loan from HVB secured by the time deposits, which liability she later claimed as a capital loss. That "specific" and "entire" transaction lacked economic

substance because Caledonian's loan proceeds related to that liability remained in the time deposits with HVB, as Caledonian's agreement with HVB required, thereby rendering Ms. Baxter's assumption of the additional liability over-and-above the value of the promissory note she acquired a riskless and meaningless undertaking. Any returns Taxpayers expected to generate from the investment of the *fifteen percent* of Caledonian's loan proceeds Ms. Baxter received had nothing to do with the economic substance of her assumption of the Caledonian's liability for the remaining *eighty-five percent* of the loan proceeds, and therefore was reasonably excluded from the Tax Court's assessment of the economic substance of the transaction *giving rise to the purported loss*.

Put simply, Ms. Baxter's assumption of liability for the remaining eighty-five percent of the proceeds did "not correspond to any actual economic losses," *ACM P'ship*, 157 F.3d at 252, and produced only "artificial losses that ha[d] only upsides—they appear[ed] on the tax return, but not the profit and loss statement"—and therefore lacked objective economic substance, *Kerman*, 713 F.3d at 864–65. Likewise, there was no "reasonable possibility of profit from the [assumption agreement] apart from the tax benefits," *Rice's Toyota*, 752 F.2d at 94, because Taxpayers received no benefit from and incurred no risk for assuming Caledonian's liability related to the eighty-five percent of the loan proceeds placed in the time deposit.

Accordingly, the Tax Court's decision to disregard the potential profitability of Taxpayers' investment plan for the loan proceeds is consistent with *ACM*'s, *Rose*'s, and other courts' focus on the "transaction" that gave rise to the loss. That approach also is

22

consistent with the approach that the Tax Court has taken in previous CARDS cases, in which it has looked at the profitability of only "the transaction that gave rise to the tax loss." *Kipnis*, 2012 WL 5271787, at \*9 (quoting *Country Pine*, 2009 WL 3678793, at \*11). And the Tax Court's approach is consistent with the Supreme Court's admonition that courts must not accord "tax effect to a 'meaningless and unnecessary incident' inserted into a transaction" because "'[a] given result at the end of a straight path is not made a different result because reached by following a devious path.'" *BB&T*, 523 F.3d at 474 (quoting *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938)). Here, Taxpayers' assumption of the remaining eighty-five percent of Caledonian's liability under its loan with HVB was a "meaningless and unnecessary incident" to the loan transaction when Taxpayers never received any of the loan proceeds giving rise to that liability and when that liability remained more than fully collateralized by funds Caledonian had on deposit with HVB.

Even if the Tax Court had reversibly erred in disregarding Taxpayers' anticipated returns from investment of their loan proceeds—which it did not—the Tax Court's other factual findings would nevertheless support its ultimate determination that the broader CARDS transaction would not be profitable due to the high fees paid to Chenery Associates and CIBC. In particular, the Tax Court found that Taxpayers' testimony that they believed that the loan would remain in place for thirty years was not credible, given that many of the operative documents had a one-year term. As explained above, that finding is not clearly erroneous, and therefore will not—and cannot—be set aside by this Court. *See supra* Part II.B.1. Accordingly, even assuming it is appropriate, in this

23

particular case, to consider the profitability of Taxpayers' investment of the loan proceeds, we must consider the expected profitability of the investments during *only* the first year of the transaction, when Taxpayers reasonably could have believed they would have access to the loaned funds.

Assuming Curtis Investment's historical average annual portfolio gain of 17.9 percent, then Taxpayers could have expected to turn the approximately $401,000 that they received in the CARDS transaction into approximately $472,000 by the end of the year. Even if we exclude Taxpayers' share of the fee Curtis Investment paid to CIBC to obtain the letter of credit, the more than $154,000 in up-front fees Ms. Baxter paid to Chenery Associates dwarfed that anticipated $71,000 return on the loaned funds.

Put differently, under the Tax Court's well-supported factual finding that Taxpayers' testimony that they expected the loan proceeds to be available for more than a year was not credible, Taxpayers could not have expected to profit from the transaction, given the high upfront fees. Accordingly, no "reasonable possibility of profit from the transaction existed apart from the tax benefits." *Rice's Toyota*, 752 F.2d at 94; *see also Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 545 (5th Cir. 2009) (declining to consider anticipated returns in later stage of transaction, "which was never intended to be reached," in profitability analysis).

Although this Court has focused on the "possibility of profit" in assessing the objective economic substance of a transaction, other Circuits have recognized that other "[i]ndicia of objective economic substance include whether the loss claimed was real or artificial, whether the transaction was part of a prepackaged strategy marketed to shelter

24

taxable gain, and whether the transaction has any practicable economic effects other than the creation of income tax losses." *Crispin*, 708 F.3d at 515 (internal quotation marks and citations omitted) (collecting cases). These additional criteria further support the Tax Court's judgment that the CARDS transaction lacked objective economic substance. The purported loss—the difference between Taxpayers' liability for the entire Caledonian-HVB loan and the promissory note Taxpayers received, which was worth only fifteen percent of the loan—was "artificial" because that additional liability always remained more-than-fully collateralized with Caledonian funds deposited at HVB. Likewise, "the transaction was part of a prepacked strategy marketed [by Chenery Associates] to shelter taxable gain." *Id.* And for the same reason that the purported loss was "artificial," the CARDS transaction had no "practicable economic effects." *Id.*

\* \* \* \* \*

In sum, the Tax Court did not clearly err in finding that Taxpayers' CARDS transaction failed both the subjective and objective prongs of the economic substance test. Accordingly, we reject the Taxpayers' claim that the Tax Court reversibly erred in finding that Taxpayers' CARDS transaction was a sham.

C.

Third, Taxpayers argue that the Tax Court improperly found that Taxpayers failed to establish reasonable cause and good faith for claiming losses based on Ms. Baxter's CARDS transaction, and therefore erred by affirming the Commissioner's imposition of accuracy-related penalties. Specifically, Taxpayers argue that the Tax Court improperly affirmed the Commissioner's imposition of a forty percent (40%) accuracy-related

25

penalty against Taxpayers because of their unlawful attempt to claim capital losses attributable to the CARDS transaction.

Sections 6662(b)(3) and 6662(h) of the Internal Revenue Code impose an accuracy-related penalty for "gross" valuation misstatements, including valuation misstatements of the magnitude at issue in Taxpayers' case. Under Section 6664(c)(1), "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Taxpayers bear the burden of establishing their "reasonable cause" and "good faith." *Gustashaw v. C.I.R.*, 696 F.3d 1124, 1139 (11th Cir. 2012). This Court reviews for clear error the Tax Court's factual findings as to reasonable cause and good faith. *Id.*; *Antonides v. Comm'r*, 893 F.2d 656, 659 (4th Cir. 1990).

In determining whether a taxpayer acted with reasonable cause and good faith, Treasury Regulations require consideration of "all pertinent facts and circumstances." Treas. Reg. § 1.6664–4(b)(1). "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *Id.* "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.*

As they did before the Tax Court, Taxpayers argue on appeal that they acted with reasonable cause and good faith because (1) they relied on the advice of their accounting

and legal advisers, and (2) the tax issues raised by their CARDS transaction were "novel" and "unsettled" at the time they entered into the transaction. We disagree.

1.

As to Taxpayers' first argument that their reasonable cause and good faith was shown by their reliance on professional advice, Treasury regulations provide that "[r]eliance on . . . professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." *Id.* A taxpayer's reliance on professional advice is objectively unreasonable if, for example, he fails to "suppl[y] the professional with all the necessary information to assess the tax matter" or if the professional "suffer[s] from a conflict of interest or lack[s] expertise that the taxpayer knew of or should have known about." *Neonatology Assocs., P.A. v. C.I.R.*, 299 F.3d 221, 234 (3d Cir. 2002).

Here, the Tax Court thoroughly considered all facts and circumstances and found that Taxpayers failed to establish reasonable and good faith reliance on the advice of their advisers. *See Curtis Inv.*, 2017 WL 3314283, at *14–16.

To begin, the court found that Taxpayers could not reasonably have relied on the tax opinion provided by Brown & Wood—which Taxpayers never engaged as their counsel—because Brown & Wood operated under a conflict of interest due to the firm's relationship with Chenery Associates, the promoter of the CARDS transaction. *Id.* at *15. Taxpayers should have been aware of that relationship, the Tax Court found, because it was disclosed in the CARDS promotional materials they received, and their advisers were informed of Brown & Wood's relationship to Chenery Associates. *Id.*

27

That finding is consistent with the finding of other courts in CARDS cases, which found that a taxpayer could not rely on the Brown & Wood opinion because of the firm's apparent conflict of interest. *See Gustashaw*, 696 F.3d at 1141; *Kerman*, 713 F.3d at 870; *see also Mortenson v. C.I.R.*, 440 F.3d 375, 387 (6th Cir. 2006) ("In order for reliance on professional tax advice to be reasonable, however, the advice must generally be from a competent and independent advisor *unburdened with a conflict of interest and not from promoters of the investment*." (emphasis added)).

The Tax Court also found that Taxpayers could not—and did not—reasonably rely on their legal and tax advisers' "independent" review of the transaction because those advisers "relied solely on the model opinion letter from Brown & Wood in formulating their [oral] opinion," and Taxpayers knew as much. *Curtis Inv.*, 2017 WL 3314283, at *14. Again, that finding is supported by record evidence, e.g. J.A. 2624 (Taxpayers' attorney averring he did not "review cases not cited in [Brown & Wood's] opinion); J.A. 2823 (Coats testifying that her firm "read [Brown & Wood's opinion] and reread it and dissected" it but "[d]idn't check every case or revenue ruling that was referred to"), and is consistent with findings rendered by other circuits in CARDS cases, *see Gustashaw*, 696 F.3d at 1124; *Kerman*, 713 F.3d at 871 .

Additionally, the Tax Court emphasized that given Ms. Baxter's twenty-year tenure as assistant manager and manager of Curtis Investment and service on Curtis Investment's investment committee, she should have known that the tax benefits of the transaction "were too good to be true." *Curtis Inv.*, 2017 WL 3314283, at *16. Put differently, "the improbable tax advantages offered by the tax shelter"—a $2.4 million-

28

dollar paper loss attributable to a transaction through which Taxpayers received slightly more than $400,000 in investable funds (less more than $154,000 in fees paid to Chenery Associates)—"should have alerted a person with [Ms. Baxter's] business experience and sophistication to the shelter's illegitimacy." *106 Ltd. v. C.I.R.*, 684 F.3d 84, 93 (D.C. Cir. 2012). Again, that finding is supported by record evidence and consistent with reasoning found not clearly erroneous in another CARDS case, *Gustashaw*. *See* 696 F.3d at 1142 (finding that "unbelievable benefits offered by the CARDS transaction" weighed against finding reasonable reliance).

Finally, the Tax Court specifically found the vast majority of Ms. Baxter's testimony not credible. For example, the court found not credible Ms. Baxter's statement that she believed, based on the advice of her accountants and lawyers, that she "would ultimately pay tax on the gain over time" because the record was devoid of evidence that Ms. Baxter's advisers rendered such advice, which ran directly contrary to the model Brown & Wood opinion on which her advisers relied. *Curtis Inv.*, 2017 WL 3314283, at *3 n.12, *12. The Tax Court also found not credible Ms. Baxter's testimony "that she would not have engaged in a CARDS transaction if the tax could have been completely avoided." *Id.* at *4 n.14. And the Tax Court found Taxpayers "purported investment motive" for engaging in the CARDS transaction "not . . . credible." *Id.* at *12. "These types of credibility determinations are ensconced firmly within the province of a trial court [and] afforded broad deference on appeal." *Neonatology Assocs.*, 299 F.3d at 228 n.9. And these adverse credibility determinations lend further support for the Tax Court's finding that Taxpayers' claim of good faith reliance on their professional advisers

29

was not credible—i.e., that Taxpayers failed to show that they "*actually relied in good faith* on [their] adviser[s'] judgment" in engaging in the CARDS transaction and claiming the deduction on their tax return. *DeCleene v. C.I.R.*, 115 T.C. 457, 477 (2000) (emphasis added); *cf. Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010) (noting "the well-settled principle that false exculpatory statements are evidence—often strong evidence—of guilt").

Taxpayers nevertheless highlight several differences between their case and another CARDS case, *Gustashaw*, to argue that the Tax Court committed clear error in finding that Taxpayers failed to establish reasonable cause and good faith, including that (1) Gustashaw's adviser admitted he was unqualified to render advice on the transaction, whereas all of Taxpayers' advisers had expertise in the area; (2) neither Gustashaw nor his adviser directly dealt with Brown & Wood, whereas Taxpayers' advisers did; and (3) Gustashaw's adviser did not offer an opinion (because he lacked expertise), whereas Taxpayers' advisers "independently" reviewed the Brown & Wood opinion and advised that the opinion was what it purported to be.

These are potentially significant differences that may have allowed the Tax Court to reach a different finding as to good faith and reasonable reliance in this case. But Taxpayers' case also is distinguishable from Gustashaw's in meaningful ways as well. In particular, Gustashaw conceded that his CARDS transaction lacked economic substance and before the Tax Court challenged *only* the accuracy related penalties. *Gustashaw*, 696 F.3d at 1133. By contrast, both before the Tax Court and this Court, Taxpayers claimed that their CARDS transaction did not lack economic substance and, in doing so, made

numerous claims as to their motive for entering into the transaction and the objective economic substance of the transaction that the Tax Court found false or non-credible. *See supra* Part II.C. Those false and non-credible exculpatory statements constitute "strong evidence" of lack of good faith not present in *Gustashaw*. *See Al-Adahi*, 613 F.3d at 1107. More significantly, *Gustashaw* did not establish the threshold for distinguishing reasonable cause and good faith reliance from the absence of reasonable cause and good faith. Rather, under Treasury regulations, courts must consider all facts and circumstances in making the *factual* determination as to whether a taxpayer met his burden of establishing reasonable cause and good faith.

Here, the Tax Court properly considered all facts and circumstances—including numerous facts and circumstances relied on by courts in other cases in which taxpayers claimed they reasonably relied on the advice of a professional—and found that Taxpayers failed to meet their burden to establish their reasonable cause and good faith reliance on the advice of their professional advisers. That factual finding is supported by record evidence and reasonable inferences therefrom. Accordingly, the Tax Court's finding as to Taxpayers' failure to establish reasonable and good faith reliance lies within the universe of permissible inferences and, therefore, is not clearly erroneous.

2.

As to Taxpayers' second argument—that the tax issues raised by Ms. Baxter's CARDS transaction were "novel" and "unsettled" at the time Taxpayers claimed losses

31

attributable to the transaction—even assuming novelty is, by itself, a basis for setting aside a penalty otherwise mandated by Section 6662(b)(3),[2] Taxpayers' argument fails.

As the Tax Court noted, at the time Ms. Baxter entered in the CARDS transaction, it was well-established that transactions lacking economic substance must be disregarded for tax purposes. *See Curtis Inv.*, 2017 WL 3314283, at \*14 (citing *Gregory v. Helvering*, 293 U.S. 465, 468–70 (1935)). At that time, it also was well-established that tax losses that "do not correspond to any actual economic losses"—like Taxpayers' purported loss attributable to Ms. Baxter's assumption of liability for the eighty-five percent of Caledonian's loan proceeds secured by the time deposits and for which she received no loan proceeds—"do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations." *ACM P'ship*, 157 F.3d at 252; *see also Shoenberg v. Comm'r*, 77 F.2d 446, 448 (8th Cir. 1935) (explaining that losses are deductible only if they are "actual and real"). And at that time, it was well-established that in examining economic substance, a taxpayer must look at the transaction giving rise to the loss, not collateral transactions, like Taxpayers' planned investment of the proceeds of the exchange of the promissory note. *See, e.g.*, *ACM P'ship*, 157 F.3d at

---

[2] The Tax Court has found, in at least in one case, that a taxpayer acted with reasonable cause and good faith when the taxpayer "had an honest misunderstanding of the law, and the position [the taxpayer] took was reasonably debatable" due to "complex and overlapping issues of tax and bankruptcy law." *Williams v. C.I.R.*, 123 T.C. 144, 153 (2004). Given that the Tax Court found numerous material aspects of Ms. Baxter's testimony noncredible, *see supra* Part II.C, the Tax Court did not clearly err in finding Taxpayers could not establish that their decision to claim the deduction did not reflect an *honest* misunderstanding of the law.

260 ("The Tax Court properly analyzed the profitability of the transactions . . . which gave rise to the disputed tax consequences."); *Basic*, 549 F.2d at 745.

Additionally, and as the Tax Court also correctly noted, just months before Ms. Baxter entered into her CARDS transaction, the Internal Revenue Service issued a formal notice regarding "Tax Avoidance Using Artificially High Basis." I.R.S. Notice 2000-44, 2000-2 C.B. 255. That notice—which was cited in the Brown & Wood's model opinion reviewed by Taxpayers' accounting and legal advisers and discussed with Taxpayers— alerted "taxpayers and their representatives" that transactions "marketed to taxpayers for the purpose of generating artificial tax losses . . . are not allowable for federal income tax purposes" because such transactions "lack[] economic substance." *Id.* Record evidence establishes that Chenery Associates marketed the CARDS transaction as a vehicle for generating artificial tax losses. And, as explained above, the Tax Court did not clearly err in finding that Taxpayers engaged in the CARDS transaction for the purpose of generating artificial tax losses, which finding is reinforced by the fact that the terms of Taxpayers' CARDS transaction were finely tuned to exactly offset Ms. Baxter's gains from the sale of her ABP stock. *See supra* Part II.B.1.

Accordingly, the well-established body of case law dealing with the economic substance doctrine, the Internal Revenue Service notice, and the record evidence pertaining to the subjective and objective economic substance of Taxpayers' CARDS transaction provided ample basis to support the Tax Court's ultimate finding that, at the time they claimed the loss, Taxpayers' "position [wa]s not reasonably debatable and [Taxpayers] did not prove that they acted with reasonable cause and in good faith."

*Curtis Inv.*, 2017 WL 3314283, at *14.[3]  Therefore, the Tax Court did not reversibly err in rejecting Taxpayers' novelty argument.

## III.

For the foregoing reasons, we affirm the judgment of the Tax Court in its entirety.

*AFFIRMED*

---

[3] In a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), Taxpayers ask this Court to set aside the accuracy related penalties on grounds that the Commissioner failed to comply with Section 6751(b)(1) of the Internal Revenue Code. That statute provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."  26 U.S.C. § 6751(b)(1).  Taxpayers did not raise that argument before the Tax Court or in its opening brief to this Court, and therefore we decline to address it now. *See Estate of Carpenter v. C.I.R.*, 52 F.3d 1266, 1274 (4th Cir. 1995) (declining to consider argument for the first time on appeal when taxpayer "never raised th[e] argument before the tax court").